Joseph H. SEYMOUR, Harold Edwards, C. W. Burke, John L. Connolly, Donald Meir, Richard L. Corbit, Robert Zahm, Arthur Preston, Gene Nicks, E. J. Strecker, H. C. Dennis and James Kirst, each in respective capacity as Trustee of the Operating Engineers Health & Welfare Fund, Joseph H. Seymour, Harold Edwards, C. V. Holder, John L. Connolly, Donald Meir, Richard L. Corbit, Robert Zahm, Arthur Preston, Steve Harrison, E. J. Strecker, H. C. Dennis, Gene Nicks, James Kirst and J. C. Maxwell, each in his respective capacity as Trustee of the Operating Engineers Pension Trust, Plaintiffs-Appellants,

v.

HULL & MORELAND ENGINEERING, a partnership, and Hull-Moreland & Associates, Inc., a corporation, Defendants-Appellees,

and

International Union of Operating Engineers, Local Union No. 12, AFL–CIO, Plaintiff in Intervention.

No. 76–3232.

United States Court of Appeals, Ninth Circuit.

Oct. 4, 1979.

Wayne Jett, Los Angeles, Cal., Goldstein, Freedman, Ownbey & Klepetar, Los Angeles, Cal., for plaintiffs-appellants.

Ronald J. Klepetar, Los Angeles, Cal., for defendants-appellees.

Before BROWNING and ANDERSON, Circuit Judges, and CLAIBORNE,* District Judge.

J. BLAINE ANDERSON, Circuit Judge:

Plaintiffs appeal from a judgment below partially denying them recovery against Hull & Moreland Engineering, a partnership, for contributions allegedly due employee trust funds under the terms of a collective bargaining agreement. Plaintiffs assign various other errors, which we discuss herein. We affirm in part, and reverse in part.

Jurisdiction below was based upon § 301(a) of the Labor Management Relations Act, 29 U.S.C. § 185(a).

## I. THE PROCEEDINGS BELOW

Plaintiffs, in their capacities as trustees of the Operating Engineers Health and Welfare Fund and of the Operating Engineers Pension Trust, respectively (trustees), brought an action against defendant Hull & Moreland Engineering, a partnership (partnership), for contributions allegedly due these trusts under the terms of collective bargaining agreements entered into with the International Union of Operating Engineers Local Union No. 12, AFL–CIO. The complaint was later amended to include Hull-Moreland & Associates, Inc., (corporation), as a defendant. The International Union of Operating Engineers (union), intervened as plaintiff, but no issue raised by the intervention is involved in this appeal.

After a bench trial, the district court entered judgment in favor of the trustees against the partnership in the amount of $1,557.07 for contributions due the Operating Engineers Health & Welfare Fund plus liquidated damages, attorneys' fees, and costs, and in favor of the Operating Engineers Pension Trust in the amount of $2,768.95 in unpaid fringe benefit contributions plus liquidated damages, attorneys' fees, and costs. According to the Amended Findings of Fact and Conclusions of Law, the partnership was liable for contributions for a period beginning January 1, 1968, through February 28, 1969, at which time the corporation became liable for contributions to the respective funds, and the partnership ceased to be liable.[1] Judgment was entered against the corporation in favor of the Operating Engineers Health & Welfare fund in the amount of $4,550.55 for unpaid fringe benefit contributions plus liquidated damages, attorneys' fees and costs. Judgment was entered in favor of the Operating Engineers Pension Trust against the corporation in the amount of $8,376.90 plus liqui-

---

* The Honorable Harry E. Claiborne, United States District Judge for the District of Nevada, sitting by designation.

1. The pertinent portions of the district court's findings read as follows:

 "6. The Partnership employed persons covered by the MSA during the period from and including January 1, 1968, through February 28, 1969.

 " * * *

 "9. The Corporation was formed on or about March 1, 1969, and became a successor to and bound by the provisions of the Agreement as if it were an original signatory party thereto."

dated damages, attorneys' fees and costs. The corporation's liability was based upon the employment of persons covered by the agreement during the period of March 1, 1969, through on or about December 31, 1973.

Plaintiffs' primary contention on appeal is that the district court erred in not holding the individual members of the partnership liable for the full amount of the contributions due the trustees, and in allowing the partners to use the corporate shield for the period after February 28, 1969. Plaintiffs also challenge rulings by the district court that certain individuals employed were "independent contractors" for whom no contributions were due, that "travel time" need not be designated on the employees' pay stubs in order to avoid contribution liability, and plaintiffs also challenge the limitation on the award of the attorneys' fees.

Neither defendant filed a cross-appeal.

## II. *THE FACTS*

Unless otherwise indicated, the development of the facts herein is taken from the district court's finding.

In December 1967, defendant Hull & Moreland Engineering, a partnership in which Herb Hull and Carl Moreland were the only general partners, signed a short-form collective bargaining agreement with the International Union of Operating Engineers, Local No. 12, which incorporated the terms of the Master Survey Agreement between the union and local chapters of the California Council of Civil Engineers and Land Surveyors. Included in the agreement was an article requiring the employers to pay a certain amount into two fringe benefit trust funds per each hour worked by employees covered by the agreement.

Almost from the inception of the agreement, Hull and Moreland failed to make full contributions to the two pension funds. The district court found that the partnership failed to pay the fringe benefits on some 5,428 hours worth of work during a period stretching from January 1, 1968, through February 28, 1968. On or about March 1, 1968, the partnership incorporated. The district court found that the corporation had underpaid the fringe benefit funds for 12,237.5 hours during the period from March 1, 1969, through December 31, 1973.

According to uncontroverted testimony, the partnership informed neither the union nor the trustees of its change to the corporate form. In fact, the trustees failed to name the corporation as a defendant in their original complaint, and did not learn of its existence until pretrial discovery. According to testimony and exhibits, the corporation continued to use printed checks bearing the partnership name for some time after incorporation, but later began using printed checks bearing the corporate name to make payments to the fringe benefit funds. The district judge found that the corporation was a valid successor to the partnership's business.

Among the employees of the partnership was a surveyor, Harold Hardin. Hardin apparently became a licensed surveyor around May 1969. The district court found that Hardin was an independent contractor for the corporation, and performed 12,276 hours of work for the corporation from May 1969, through September 1973. The corporation did not make, and was not obligated to make, contributions for this time, according to the district judge. Beginning October 1, 1973, Hardin did some of his work through a corporation known as Kern Engineering. Herb Hull and Carl Moreland were corporate officers of Kern Engineering and owned 50% of its stock. The corporation utilized Kern Engineering for 3,273.5 hours of work from October 1, 1973, through August 31, 1975. During the same period, Harold Hardin performed 1,379.5 hours of field survey work, and was paid either by Kern Engineering, or by the corporation directly. The court below found that the corporation was not liable for contributions for the time worked either by Hardin or for the time worked by other Kern Engineering employees.

The defendants raised as a defense the contention that certain of the contributions

sought by the trustees were based on hours spent as "travel time." Article IX(L)(4) of the Master Survey Agreement required that all contributions for "travel time" be clearly designated as such on employee pay stubs. The defendants failed to designate the hours claimed as "travel time" on the stubs, but offered at trial a record of accounting in which travel time had been kept. The trial court found that the defendants were not liable for the claimed "travel time," Article IX(L)(4) notwithstanding.

From the evidence submitted, it could be inferred that the failure of both the partnership and the corporation to make the payments was deliberate, and motivated solely by economic considerations.

It would appear from the evidence submitted that the corporation now lacks sufficient assets to pay the judgment assessed below for the unsatisfied contributions, though there is some conflict in the evidence on this point.

Further details will be developed in the course of the opinion.

### III. ISSUES PRESENTED ON APPEAL

1. Did the trial court err in refusing to pierce the corporate veil and find the partners Herb Hull and Carl Moreland individually liable for contributions due after February 28, 1969?

2. Did the trial court err in holding the defendants not liable to make contributions for the time worked by Harold Hardin and by employees of Kern Engineering?

3. Did the trial court err in allowing the defendants to deduct hours based upon "travel time" not reported on employee pay stubs from total contribution liability?

4. Did the trial court abuse its discretion in limiting the award of attorneys' fees to the trustees to $10,000?

2. 29 U.S.C. § 185(a) reads as follows:
 "Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this Act, or between any such labor organizations, may be

### IV. PIERCING THE CORPORATE VEIL

The trustees' main contention on appeal is that the district court should have pierced the corporate veil of Hull-Moreland Associates, Inc., and held Herb Hull and Carl Moreland, the sole shareholders of the corporation, liable for unpaid contributions due the fringe benefit funds after February 28, 1969. The trustees point to a variety of factors here, most notably Hull and Moreland's sole ownership of the corporation, the alleged failure to observe certain corporate formalities, and the allegedly poor financial condition of the corporation today. While the trustees have raised some meritorious points, we find that the trial court correctly applied the law to the facts and must affirm its judgment on this point.

### A. The Applicable Law

■ The trustees brought this action under section 301(a) of the Labor Management Relations Act of 1947, 29 U.S.C. 185(a).[2] In considering actions or suits to enforce labor contracts under 301(a), the court must apply federal substantive law, though the court may look to state law for guidance. Textile Workers Union v. Lincoln Mills, 353 U.S. 448, 456, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957); see also, e. g., Rehman v. Smith, 555 F.2d 1362 (9th Cir. 1976); Barrett v. Safeway Stores, Inc., 538 F.2d 1311 (8th Cir. 1976). State law may be resorted to, however, only if it effectuates the policy which underlies federal labor legislation. Textile Workers Union, supra, at 457.

■ It is clear from the case law that the paramount policy served by the remedy provided under 301(a) is consistency in the enforcement of labor contracts. The overriding federal policy of industrial peace and productivity is best effectuated if collective bargaining agreements are interpreted and enforced in a uniform manner. The Su-

brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties."

preme Court has consistently emphasized the need for a unified national law of labor contracts. See *International Union v. Hoosier Cardinal Corp.*, 383 U.S. 696, 86 S.Ct. 1107, 16 L.Ed.2d 192 (1966),[3] *Teamsters Union v. Lucas Flour Co.*, 369 U.S. 95, 82 S.Ct. 571, 7 L.Ed.2d 593 (1962). *Cf. Pence Construction Co. v. Hoisting & Portable Engineers Local 450*, 484 F.2d 398, 401 (5th Cir. 1973). As Mr. Justice Stewart's majority opinion in *Lucas Flour, supra*, observed:

> "[t]he importance of the area which would be affected by separate systems of substantive law makes the need for a single body of federal law particularly compelling. The ordering and adjusting of competing interests through a process of free and voluntary collective bargaining is the keystone of the federal scheme to promote industrial peace. State law which frustrates the effort of Congress to stimulate the smooth functioning of that process thus strikes at the very core of federal labor policy."

369 U.S. 95, 104, 82 S.Ct. 571, 577. The trial judge apparently relied, at least in part, on California state law in determining that the liability of the corporation should not extend to Herb Hull and Carl Moreland as individuals. The defendants below and on appeal rely heavily upon the opinion of the California Court of Appeals in *Arnold v. Browne*, 27 Cal.App.3d 386, 103 Cal.Rptr. 775 (1972), which contains a rather exhaustive listing of the factors a court should look to in determining whether to disregard the corporate entity and impose liability upon individual shareholders.[4]

■ Reliance upon state corporate law is proper if consistent with the federal policy of uniform interpretation and enforcement of collective bargaining agreements. We need not go so far as to rely completely upon state law here, however, because federal case law also provides some guidance, although not in the context of the collective bargaining agreement.[5] The Supreme Court, for example, refused to allow certain

**3.** Mr. Justice Stewart's majority opinion noted that:
> "[t]he need for uniformity, then, is greatest where its absence would threaten the smooth functioning of those consensual processes that federal labor law is chiefly designed to promote—the formation of the collective agreement and the private settlement of disputes under it."

383 U.S. 696, 702, 86 S.Ct. 1107, 1111.

**4.** "Among the possible factors pertinent to the trial court's determination are: commingling of funds and other assets, failure to segregate funds of the separate entities, and the unauthorized diversion of corporate funds or assets to other than corporate uses; the treatment by an individual of the assets of the corporation as his own; the failure to obtain authority to issue or subscribe to stock; the holding out by an individual that he is personally liable for the debts of the corporation; the failure to maintain minutes or adequate corporate records and the confusion of the records of the separate entities; the identical equitable ownership in the two entities; the identification of the equitable owners thereof with the domination and control of the two entities; identification of the directors and officers of the two entities in the responsible supervision and management; the failure to adequately capitalize a corporation; the absence of corporate assets, and undercapitalization; the use of a corporation as a mere shell, instrumentality or conduit for a single venture or the business of an individual or another corporation; the concealment and misrepresentation of the identity of the responsible ownership, management and financial interest or concealment of personal business activities; the disregard of legal formalities and the failure to maintain arm's length relationships among related entities; the use of the corporate entity to procure labor, services or merchandise for another person or entity; the diversion of assets from a corporation by or to a stockholder or other person or entity, to the detriment of creditors, or the manipulation of assets and liabilities between entities so as to concentrate the assets in one and the liabilities in another; the contracting with another with intent to avoid performance by use of a corporation as a subterfuge of illegal transactions; and the formation and use of a corporation to transfer to it the existing liability of another person or entity."

27 Cal.App.3d 386, 394, 395, 103 Cal.Rptr. 775, 781, 782 (1972).

**5.** Our research yields only one decision dealing with the applicability of state corporate *alter ego* doctrines to disputes arising under collective bargaining agreements. In *Wiley & Sons v. Livingston*, 376 U.S. 543, 84 S.Ct. 909, 11 L.Ed.2d 898 (1964), the Supreme Court held that a company which had merged with a smaller company assumed the smaller company's duty to arbitrate. *Wiley & Sons* was based upon the strong federal policy favoring arbitrability of labor disputes, and is not of much help in the present case.

corporations to bring antitrust and security actions where the controlling shareholders had participated in the alleged violations in *Bangor Punta Operations v. Bangor & Aroostook Railroad Company*, 417 U.S. 703, 94 S.Ct. 2578, 41 L.Ed.2d 418 (1974). The Court in *Bangor Punta* noted that the corporate form may be disregarded where used "to defeat an overriding public policy. . . . ." 417 U.S. 703, 713, 94 S.Ct. 2578, 2584.

■ Our own circuit has developed certain guidelines dealing with disregard of the corporate entity. In *United States v. Standard Beauty Supply Stores, Inc.*, 561 F.2d 774 (9th Cir. 1977), we identified two primary elements to the "piercing" doctrine. First, the court must find that there is such a unity of interest and ownership between the corporation and the shareholder that the two no longer exist as separate entities. 561 F.2d 774, 777. Second, it must be shown that "failure to disregard the corporation would result in fraud or injustice." 561 F.2d 774, 777. In *Standard Beauty Supply*, we refused to disregard the corporate entity in an action against a shareholder of a corporation which had defaulted on a Small Business Administration loan where there had been no commingling of personal and corporate funds, board of directors meetings had occurred regularly, and corporate records had been kept.

Other decisions in this circuit have emphasized the injustice created by recognition of its corporate entity, and the intent of the incorporators to evade civil or criminal liability. *See Swanson v. Levy*, 509 F.2d 859 (9th Cir. 1975); *Plumbers & Fitters, Local 761 v. Matt J. Zaich Construction Co.*, 418 F.2d 1054 (9th Cir. 1969). Decisions

in other circuits are substantially in accord. *See, e. g., Casanova Guns, Inc. v. Connally*, 454 F.2d 1320, (7 Cir. 1972), *cert. denied*, 409 U.S. 845, 93 S.Ct. 48, 34 L.Ed.2d 85 (1972).

Viewing the jumble of federal decisions together, we find a sort of generalized federal substantive law on disregard of corporate entity which concentrates on three general factors: the amount of respect given to the separate identity of the corporation by its shareholders, the degree of injustice visited on the litigants by recognition of the corporate entity, and the fraudulent intent of the incorporators.[6] Federal decisions naturally draw upon state law for guidance in this field.[7]

We find application of the law as formulated above to be appropriate in this case. The traditional rules on disregard of the corporate entity do not expose interpretation and enforcement of labor contracts to the risk of disharmony which 301(a) is designed to prevent. At most, the quality of the remedy only is affected if a labor organization finds itself with a judgment against an insolvent corporate shell. Since the traditional rule demands that individuals incorporate in good faith, with adequate capital, and observe a minimum of corporate formalities, the doctrine should, in most cases, afford adequate protection to the quality of the remedy.

This is not to suggest that under different circumstances another rule might not apply. Courts must always evaluate litigation under 301(a) with an eye to the policy of uniformity which that statute embodies. In cases where change of business form might present a more direct threat to uniformity, courts would be required to take a harder look at the corporate form.

---

**6.** There is one decision of the Supreme Court relevant to disregard of the corporate entity which deserves some comment because it appears to lay down a rule which is more rigorous than that expressed in later decisions. In *Anderson v. Abbott*, 321 U.S. 349, 64 S.Ct. 531, 88 L.Ed. 793 (1944), the Supreme Court held that individual shareholders of a bank-stock holding company could be assessed individually for shares held in a national bank. The Court held that the good faith of the incorporators and initially adequate capitalization were irrelevant factors in the face of a federal statute which

expressly mandated individual liability for shareholders of a national bank. [12 U.S.C. § 63 (repealed by Act Sept. 8, 1959, P.L. 86–230, § 7, 73 Stat. 457)]. The present case is distinguishable since there is no federal statute applicable which so directly mandates individual liability.

**7.** Our opinion in *United States v. Standard Beauty Supply Stores, Inc.*, 561 F.2d 774 (9th Cir. 1977), cited, among other decisions, *Arnold v. Browne*, 27 Cal.App.3d 386, 103 Cal.Rptr. 775 (1972), discussed at note 4, *supra*.

### B. *Adequacy of the Corporate Shield*

█ Applying the rules stated above to the facts of this case, we are satisfied that the trial court did not err in finding that the partnership was not liable for the unpaid contributions assessable against the corporation.

Looking to the first prong of the analysis, we find that sufficient respect was paid the corporate formalities here. The trustees have pointed to several factors which they claim indicate that Hull and Moreland did not properly observe the corporate formalities. There was evidence that no more than four corporate meetings were held, and evidence concerning interest-free loans taken from the corporation, along with a possibly questionable "bonus" paid to each from a sale of corporately-owned real estate.[8] The trustees also make reference to the ever-deteriorating financial picture of the corporation and the partners' lack of attention to it by 1974 as further evidence of a disrespect for corporate individuality.

We agree that these facts tend to indicate a degree of informality in the structure of the corporation. There are other factors, however, which tend to indicate that the corporate formalities were properly observed. It appears from the evidence that separate corporate records were maintained, and presented at trial.[9] It also appears that Hull and Moreland drew only reasonable salaries from the corporation of around $24,000 per annum (R.T. 324). Stock in the corporation was formally issued to both Hull and Moreland, and the partnership assets were acquired at the time of incorporation (R.T. 181).

There was no evidence of some of the more serious forms of abuse of the corporate entity. There was no evidence of commingling of the personal funds of Hull and Moreland with those of the corporation. There was no evidence that either Hull or Moreland treated any of the corporation's assets as his own. Perhaps more importantly, there is no real evidence that the corporation ever owned less than an adequate amount of assets to carry on its business.

In short, there was sufficient evidence of a respect for corporate formalities here to support the finding of the trial court that Hull and Moreland should not be held liable for the corporation's liability to the fringe benefit funds.

Even if there were stronger evidence of disregard of formalities, we find that the trustees fail on the second prong of the analysis. There was no evidence of any

---

**8.** Hull offered the following testimony on the loan:

"Q. Did the corporation ever advance any funds to you that you later paid back?
A. Yes, that's right. Yes.
Q. And what were those amounts?
A. I don't know. I was building a house one time and it seemed like I borrowed $4,000 or so from the corporation. Maybe five.
Q. Now, do you recall when that was?
A. Probably back in about '72 or so.
Q. What were the terms of that loan? How long a loan was it?
A. I don't recall. Probably—Probably a year promissory note.
Q. Was there any note written on it?
A. A note?
Q. Yes. A promissory note.
A. I would imagine there was.
Q. You don't recall whether there was anything in writing evidencing the amount that the corporation loaned you?
A. Well, I'm sure there was, but I can't recall.

Q. Do you recall what the interest rate was?
A. Well—
Q. Was there an interest rate?
A. I don't believe there was an interest rate.
Q. No interest rate?
A. I don't think so.
Q. Did you pay the funds back?
A. Well, I either paid them back or Moreland took his out in the same amount in terms of a bonus. I'm not sure. I think I paid it back then redrew it again to keep the records straight."
Reporter's Transcript (R.T.) at 98–99, volume IV.
Hull also testified that he and Moreland divided the $6,000 of proceeds on a real estate transaction "Because it was mine." (R.T. 131).

**9.** The defendants offered into evidence various balance sheets and profit and loss statements for the corporation from 1969 through 1975. Defendants' Exhibits E, F, G, H, I, and J. R.T. 314–322.

fraudulent intent in forming the corporation, and we find no substantial injustice will result if we respect the corporation.

While there was a substantial amount of evidence from which the bad faith of Hull and Moreland might be inferred in disregarding their obligations to the fringe benefit funds,[10] no evidence of bad faith or fraudulent intent in forming the corporation was presented. The corporation appears to have been adequately capitalized at the outset.[11] Furthermore, the corporation existed as an ongoing enterprise, at least until 1974. The very fact of continuing to do business for a period of at least five years tends to indicate a good faith use of the corporation to conduct a legitimate business enterprise. The trustees have asked that we infer a fraudulent draining of the corporate assets from the corporation's somewhat bleak financial situation at the time of trial.[12] We cannot infer fraud, however, simply on the basis of bad financial times. There was evidence from which the trial judge could reasonably have inferred that the corporation had simply endured a period of slow business,[13] perhaps the most common risk in the business world. The trustees have shown us nothing which clearly contradicts such an inference.

On this point, the present case is distinguishable from *UAW v. Cardwell Manufacturing Company, Inc.*, 416 F.Supp. 1267 (D.C.Kan.1976), in which a parent corporation was held liable for contributing to fringe benefit funds owed by a subsidiary corporation. The district court in *Cardwell Manufacturing* specifically found that the defendants had committed "misrepresentation and fraud upon the plaintiffs." 416 F.Supp. 1267, 1283. The parent there had complete control over the subsidiary, and evidence was produced tending to indicate that both had acted in bad faith.

Lastly, we see no injustice in the effect of the trial court's findings. While it is true that the trustees apparently have a judgment for several thousand dollars against an insolvent defendant, their inability to collect does not, by itself, constitute an inequitable result. Taking all that we have said previously, including our findings of good faith use of the corporate entity, we cannot say that the equities balance so clearly in favor of the trustees that the judgment must be reversed.

All in all, the finding of the trial court that the partnership should not be liable for the unpaid fringe benefit obligations of the corporation was not clearly erroneous.

### C. The Corporation's Assumption of the Partnership Obligations

■ A subsidiary issue under the corporate entity problem is whether the corpora-

---

**10.** In the Amended Findings of Fact and Conclusions of Law in Favor of Plaintiffs, the trial judge found that:

"[t]he plaintiffs placed trust and confidence in the defendants that defendants would report all hours and pay all contributions to the Trusts as required by the Agreement. After entering into the Agreement, defendant partnership, knowingly in breach of the Agreement, failed to report 5,428.0 hours worked during the period from on or about January 1, 1968, through on or about February 28, 1969, and failed to pay contributions thereon during the period from on or about March 1, 1969, through on or about December 31, 1969, defendant corporation, knowingly in breach of the Agreement, failed to report 3,716.5 hours worked and failed to pay contributions thereon."

Finding of Fact No. 21.

**11.** Defendants' Exhibit E, the corporation's financial statement for the period ending August 31, 1969, the first six months of the corpora-

tion's existence, showed assets of $118,514.04, including cash of $14,906.49. The initial capital input was $12,000. While the court presumes no expertise in capital structures of engineering firms, the corporation does appear to have received an adequate amount of starting capital.

**12.** There is some disagreement on the question of exactly how much the corporation was worth at the time of trial. According to Carl Moreland's testimony, the corporation had assets of, at least, $20,000 (R.T. 311–313). The trustees, meanwhile, have maintained all along that the corporation is completely insolvent. Even if Moreland's assessment is taken as correct, though, the corporation was clearly not in the best of financial health at the time the case went to trial.

**13.** As Herb Hull testified, the reason for the increasingly dark financial picture was simply that "[w]e didn't make any money." (R.T. 88).

tion's assumption of the partnership's obligations created, in effect, a novation of the partnership's commitment to the fringe benefit funds. The trial court found that the corporation was a valid successor to the partnership. The partnership was, therefore, no longer obligated under the agreement unless it employed someone in the name of the partnership.

The trustees contend that since they had no notice of the change in form, and did not consent to such a change, that the partnership remained primarily liable for the corporation's fringe benefit liabilities. Even if we assume that federal law requires notice and consent in such circumstances, we find that adequate notice was given and that the trustees are deemed to have consented by their conduct in continuing to accept contributions from the corporation.

Although the record is not clear here on the exact dates involved, it is apparent that its trustees began accepting checks which were printed in the name of the corporation sometime in 1969.[14] Since the trustees accepted such checks for a number of years, they were on constructive notice of the change in form, and must be deemed to have consented to the new arrangement. The trustees have argued that they receive a huge number of checks daily in their capacity as professional trustees, and cannot be responsible for noting every check that comes through. We find this argument to be without merit because it would virtually eliminate the concept of constructive notice in today's business world.

## V. LIABILITY FOR TIME WORKED BY INDEPENDENT SUBCONTRACTOR

 The trustees contend that the defendants are liable for the time worked by Harold Hardin and by the employees of Kern Engineering. The trial court found that this time had been worked by independent contractors, and that neither the partnership nor the corporation could be held liable for contributions on that basis.[15] The trustees assign error on these rulings. We agree, and reverse on this point.

The trustees have essentially presented three arguments in favor of reversal here. They argue first that the trial court improperly amended the pre-trial stipulation to allow the defendants to raise the independent contractor defense. Secondly, they argue that neither Hardin nor anyone else employed by Kern Engineering was an independent contractor as a matter of law. Finally, they argue that the collective bargaining agreement binds the defendants to make contributions measured by the work of non-signatory subcontractors, in any event. We agree with the trustees' third contention and therefore find it unnecessary to reach the first two.

Article VIII of the 1969–1974 Master Survey Agreement provides that:

"[i]t is further agreed that should any Employer sublet any part or portion of his work covered by this Agreement to any other Employer or Sub-employer, the provisions of this Agreement shall be binding upon and applicable to all work performed by said Sub-employer on the job site."

Article VIII was brought to the trial court's attention and no express ruling on its effect was handed down;[16] however, it is obvious that the court could not have found the defendants not liable for Hardin's time without also finding that Article VIII imposed no obligation.

The trustees contend on appeal that Article VIII is subject to only one lawful inter-

---

**14.** The corporation at first continued to use checks printed in the name of the partnership, but later began sending printed checks bearing the corporate name. (R.T. 181–182).

**15.** *See* Amended Findings of Fact and Conclusions of Law in Favor of Plaintiffs, Nos. 14, 16, 18, and 19.

**16.** Indeed, the judge appeared to rule during the trial that Article VIII barred the independent contractor defense (R.T. 215), only to reverse himself sometime later. (R.T. 356–357).

pretation, and that this court must give it that interpretation in accordance with the principle that a contract provision should not be interpreted in a fashion which renders it meaningless. According to the trustees, the only lawful interpretation that can be given article VIII is that it requires the defendants to make contributions to the fringe benefit funds measured by hours worked by non-signatory subcontractors, but that such contributions are not to be on behalf of such subcontractors. The trustees thus propose an interpretation somewhat analogous to an exclusive listing arrangement in the real estate brokerage field: regardless of who actually does the work, the union's fringe benefit fund will be compensated.

The language of Article VIII is reasonably susceptible to the trustees' interpretation. Even though the language does not speak in terms of affirmatively requiring the employer to bind subcontractors to the Master Survey Agreement, it does say that the provisions of the agreement "shall be binding upon and applicable to" work performed by subcontractors. If the agreement is "applicable" to subcontractors' work, then it is reasonable to infer that the employer must make contributions to the fringe benefit funds based upon non-signatory subcontractors' work.

This ambiguous provision, however, is susceptible to several interpretations. The trustees maintain that under federal labor legislation theirs is the only lawful interpretation. The trustees cite *Walsh v. Schlect,* 429 U.S. 401, 97 S.Ct. 679, 50 L.Ed.2d 641 (1977), for the proposition that so-called "subcontractors' clauses" calling for payment of fringe benefits to union trust funds are legal only if they require payments to the fund generally, based upon hours worked by subcontractors, and not to make payments on behalf of employees not covered by the agreement. The restrictive interpretation of such clauses, according to *Schlect,* is mandated by § 302 of the Labor Management Relations Act, 29 U.S.C. § 186. § 302 makes unlawful the payment of anything of value by an employer to ". . . any representative of any of his employees who are employed in an industry affecting commerce . . . ." 29 U.S.C. § 186(a)(1). § 302 was intended to prevent bribery of union officials by employers. Among the exceptions to this rule, however, is a provision which allows payments to trust funds ". . . for the sole and exclusive benefit of the employees of such employer . . . ." 29 U.S.C. § 186(c)(5). *Walsh* held that one side effect of § 302 is that employers may make contributions only to trust funds established for their own employees, and not for the benefit of a non-employee independent contractor. Accordingly, subcontractors' clauses may require only that contributions be made measured by the hours worked by such non-employees.

■ It is well-settled that ambiguously-worded contracts should not be interpreted to render them illegal and unenforceable where the wording yields a construction which is both legal and enforceable. *Walsh v. Schlect,* 429 U.S. 401, 408, 97 S.Ct. 679 (1977); *cf. In re Wonderfair Stores, Inc. of Arizona,* 511 F.2d 1206 (9th Cir. 1975); *Washington Capitols Basketball Club, Inc. v. Barry,* 419 F.2d 472 (9th Cir. 1969). Unless Article VIII be given the construction mandated by *Walsh,* it has no logical or legally enforceable meaning. If the union cannot compel payments to fringe benefit funds based upon Article VIII, then there is little that it can enforce under that article. With all the signposts pointing so forcefully in the direction of one interpretation, we have no choice but to give the contract that interpretation. Accordingly, we reverse here and instruct the district court to increase the amount of the judgment by the number of hours worked by Harold Hardin and other employees of Kern Engineering on behalf of the defendants.

## VI. TRAVEL TIME

■ The trustees have assigned as error the treatment by the district of so-called "travel time" in computing the defendants' liability to the fringe benefit funds. We disagree with the trustees' contentions.

Articles XV and XVI of the 1969–1974 Master Survey Agreement specifically exempted "travel time" from contribution liability for each of the fringe benefit funds at issue here. Article IX(L) of the agreement provides that employees who must travel from the employer's office to the job site are to be paid for the time spent in traveling. IX(L)(4) further provides that:

> "[t]ravel time required to be paid herein may be included in the regular day's pay, but shall be designated as such on the paycheck stub, provided total time, including travel time, shall exceed eight (8) hours in any one day."

The employer, then, is bound under the agreement to designate all travel time pay in excess of eight hours a day on the employee pay stub.

At trial, the defendants argued that certain hours for which the trustees claimed contributions were due were travel time hours not covered by the fund obligation. It was undisputed that defendants had never designated any of the claimed hours as "travel time" on employee pay stubs. The trial court held that the failure to designate travel time on the pay stubs was immaterial, and that records kept of travel time payment could be introduced.[17]

Neither party has cited any controlling authority on this point, and our research has uncovered no decisions on point. No evidence on the intent of the parties was offered. Our only task on appeal then is to determine whether the trial court reasonably interpreted the agreement.

Neither Article XV nor XVI specifically cross-references to Article IX. Each simply states a blanket exemption for "travel time" with no mention of pay stub designation. IX(L)(4) is not clearly drafted, and might be reasonably interpreted to require designation of travel time on the check stub only when travel time compensation increases a day's wages in excess of eight hours. Travel time compensation within an eight-hour total would not be reported under such an interpretation.

The trustees have maintained that the pay stub designation is important to alert employees that they are not receiving fringe benefits for a certain portion of their wages. While this argument certainly makes sense, the agreement in question does not compel such a conclusion. If the purpose of the pay stub reporting requirement were to inform employees of possible fringe benefit deficiencies, then the agreement would have made clear that *all* exempt travel time must be reported on the pay stubs. The court below could reasonably have found that the reporting requirements of Article XV and XVI were unrelated to the travel time exemptions in Articles VI and XVI. Even if the sections are related, the court might reasonably have inferred that failure to designate on the pay stubs did not necessarily negate the travel time exemption, and that other evidence of travel time could be used. In the face of an ambiguous and indirect contract, we have no basis for finding error on the part of the trial court.

## VII. *ATTORNEYS' FEES*

The trustees requested an award of $20,000 in attorneys' fees. The court awarded $10,000 in attorneys' fees, and apportioned $1,400 of that award to the partnership. The trustees assign error on both the amount of the award and the apportionment. We affirm.

■ It is well-settled that the award of attorneys' fees is a matter within the discretion of the trial court, and that an award of attorneys' fees cannot be disturbed on appeal, absent a showing of abuse of discretion. *See, e. g., Jacobsen v. Rose,* 592 F.2d 515 (9th Cir. 1978); *Fountila v. Carter,* 571 F.2d 487 (9th Cir. 1978); *Kerr v. Screen Extras Guild, Inc.,* 526 F.2d 67 (9th Cir. 1975), *cert. denied,* 425 U.S. 951, 96 S.Ct. 1726, 48 L.Ed.2d 195 (1976); *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d

---

17. Defendants' Exhibit D is a summary of employee pay records maintained by Carl Moreland. The records kept designated such expenditures as mileage, travel time, etc. (R.T. 230–271).

714 (5th Cir. 1974); *Transport Manufacturing & Equipment Company v. Fruehauf Trailer Company,* 295 F.2d 223 (8th Cir. 1961). We see no reason why this standard should not apply in cases of this nature.

■ The factors to be taken into account in fixing the size of the award were enumerated in *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714 (5th Cir. 1974). Following Disciplinary Rule 2–106 of the Code of Professional Responsibility of the American Bar Association, *Georgia Highway Express* mandated that courts consider the following in fixing attorney's fee awards: (1) the time and labor required; (2) the novelty and difficulty of the questions presented; (3) the skill requisite to perform the legal services properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases. 488 F.2d 714, 717, 718, 719. Failure to follow these guidelines constitutes an abuse of discretion. *Kerr v. Screen Extras Guild, Inc.,* 526 F.2d 67 (9th Cir. 1975), *cert. denied,* 425 U.S. 951, 96 S.Ct. 1726, 48 L.Ed.2d 195 (1976).

■ Application of these factors will necessarily vary from case to case. A key factor in today's case may be irrelevant to determining tomorrow's award. The court below clearly considered a number of the guidelines in fixing the award here. At a post-trial hearing, the court expressed its belief that the amount of recovery was perhaps the most important factor.[18] The court also considered the difficulty, and the standard fee in such matters. The court did not feel that the amount of time expended, 405 hours, was justified by the case, a judgment which we cannot say abuses the court's discretion. In light of its proper consideration of the enumerated factors, we find that the amount of attorneys' fees awarded was within the permissible range of discretion.

We also find that the allocation among the defendants was a permissible exercise of the court's discretion. The court based the allocation upon the percentage of time that each had been involved in the breach of the agreement.[19] Since the partnership had been involved for a total of 14% of time, it was assessed for 14% of the total fee award. This appears to be a reasonable basis for allocation, and we do not disturb this finding on appeal.

## VIII. *CONCLUSION*

The judgment of the court below is affirmed, with the exception of its finding on contribution liability for time worked by non-signatory subcontractors. We remand to the district court for the appropriate amendment to the judgment.