IDAHO PLUMBERS AND PIPEFITTERS HEALTH AND WELFARE FUND, Idaho Plumbers and Pipefitters Pension Fund, Idaho Plumbers and Pipefitters Apprenticeship and Journeymen's Training Fund, Idaho Plumbers and Pipefitters Savings Trust Fund, National Plumbers and Pipefitters Pension Fund, the Southwest Idaho-Southeast Oregon Building and Construction Trades Council, AFL–CIO, Idaho State Pipe Trades Association, and Local Union No. 196 of the United Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industry of the United States and Canada, AFL–CIO, Plaintiffs,

v.

TURNKEY CONSTRUCTION, INC., an Idaho corporation, and Union Plumbing and Heating, Inc., an Idaho corporation, Defendants.

Civ. No. 83–1407.

United States District Court, D. Idaho.

Nov. 20, 1984.

Andrew M. Chasan, Lyons, Bohner, Chasan & Walton, Boise, Idaho, for plaintiff "Trust Funds".

William L. Mauk, Alan C. Herzfeld, Skinner, Fawcett & Mauk, Boise, Idaho, for remaining plaintiffs.

Wayne V. Meuleman, Meuleman & Miller, Boise, Idaho, David H. Wilson, Jr., Calvin L. Keith, Bullard, Korshoj, Smith & Jernstedt, P.C., Portland, Or., for defendants.

## MEMORANDUM OPINION

RYAN, District Judge.

### INTRODUCTION

This action centers around the construction of the Morrison Center for the Performing Arts on the campus of Boise State University in Boise, Idaho. The plaintiffs seek redress for alleged violations of an agreement entered into between the Defendant Turnkey Construction, Inc. (Turnkey), as the general contractor on the project, and the labor unions whose members would be working on the project. Jurisdiction was taken pursuant to Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185 (1976).

Plaintiffs Southwest Idaho-Southeast Oregon Building and Construction Trades Council, Idaho State Pipe Trades Association, and Local Union No. 296 of the United Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industry of the United States and Canada, AFL–CIO (hereinafter collectively referred to as "Pipe Trades"), and Idaho Plumbers and Pipefitters Health and Welfare Fund, Idaho Plumbers and Pipefitters Pension Fund, Idaho Plumbers and Pipefitters Apprenticeship and Journeymen's Training Fund, Idaho Plumbers and Pipefitters Savings Trust Fund, and National Plumbers and Pipefitters Pension Fund (hereinafter collectively referred to as "Trust Funds"), moved for partial summary judgment on that portion of the Complaint alleging violations of the agreement by Turnkey. Defendant Turnkey filed cross-motions for summary judgment as to those same allegations.

### FACTS

The dispositive facts are not in dispute. In September 1981, the State of Idaho awarded the contract for construction of the Morrison Center for the Performing Arts to Turnkey as the general contractor on the project. On October 21, 1981, Turnkey entered into a "Project Agreement" with various labor unions whose members would be working on the project. Turnkey subsequently entered into a written subcontract with Marcum, Inc., for the performance of the mechanical work on the project. This subcontract between Turnkey and Marcum included a provision in which Marcum agreed to comply with the terms of the Project Agreement. At the time this subcontract was executed, Marcum was signatory to a local collective bargaining agreement with Local 296 of the Plumbing and Pipefitters Union.

Marcum then entered into an oral subcontract with Defendant Union Plumbing and Heating, Inc. (Union Plumbing), for the performance of the plumbing, heating, and air conditioning work to be done on the project. At the time this oral subcontract was executed, Union Plumbing was signatory to a local collective bargaining agreement with Local 296 of the Plumbers and Pipefitters Union. Union Plumbing, however, did not agree to be bound by the terms of the Project Agreement. Construction began on the project in December 1981.

The collective bargaining agreement existing at the time construction began, between Local 296 and the local contractors, was scheduled to expire May 31, 1982. A new contract was negotiated and took effect on June 1, 1982. This agreement expired on May 31, 1983. Although a new agreement was entered into between the union and most local contractors, Union Plumbing was unable to reach a new labor agreement with Local 296 and the existing agreement between those parties expired without replacement on May 31, 1983. Union Plumbing, however, continued to do mechanical work on the project utilizing non-union personnel. The plaintiffs have

brought suit against Turnkey and Union Plumbing alleging violations of the Project Agreement based upon the performance of non-union work by Union Plumbing subsequent to May 31, 1983.

## DISCUSSION

The motions for partial summary judgment before the court deal with that portion of the Complaint alleging breach of Article X of the Project Agreement by Turnkey. Article X is commonly referred to as a "union signatory subcontractor clause" and provides in part:

> The Employers shall contract or subcontract any work to be done at the site of the project only to persons, firms or corporations who agree in writing to comply with all of the terms and conditions of this agreement and sign the local agreement of the appropriate Union or Unions covering the work.

Plaintiffs Pipe Trades and Trust Funds contend that Article X obligates Turnkey to require its subcontractors and sub-tier subcontractors to agree in writing to be bound by the Project Agreement and to sign a local collective bargaining agreement with the appropriate unions. Plaintiffs also contend Article X imposes on Turnkey a continuing obligation to ensure that its subcontractors and sub-tier contractors comply with the terms of the Project Agreement and continue to be signatory to the local collective bargaining agreement with the appropriate unions. Plaintiffs argue that Turnkey should have terminated Union Plumbing's work on the project upon Union Plumbing's failure to be signatory to the appropriate local bargaining agreement.

Defendant Turnkey, on the other hand, asserts that Article X should be read literally, imposing on Turnkey only the obligation that they require their subcontractors to agree in writing to comply with the Project Agreement and, at the time of subcontracting, be signatory to the appropriate local bargaining agreements. Under Turnkey's interpretation of Article X, its obligation was satisfied when it subcontracted the mechanical work to Marcum, and Marcum (1) agreed in the written subcontract to be bound by the terms of the Project Agreement, and (2) Marcum was signatory to the appropriate local collective bargaining agreement at the time that subcontract was executed. Alternatively, Turnkey contends that Article X is illegal and unenforceable as in violation of Section 8(e) of the National Labor Relations Act, 29 U.S.C. § 158(e) (1976).[1]

### 1. Legality of Article X

Article X of the Project Agreement does not violate Section 8(e) because it falls within the exception to Section 8(e) known as the "construction industry proviso."[2] Read literally, there would be no question the construction industry proviso exempts Article X from the proscription of Section 8(e). The Supreme Court, however, has limited application of the construction industry proviso to those subcontracting agreements that were sought or obtained in the context of a collective bargaining relationship even though they are otherwise covered by the plain language of the statute. *Woelke & Romero Framing, Inc. v. National Labor Relations Board, et al.,* 456 U.S. 645, 653, 102 S.Ct. 2071, 2076, 72

---

**1.** Section 8(e) provides in part:

> It shall be an unfair labor practice for any labor organization and any employer to enter into any contract or agreement, express or implied, whereby such employer ceases or refrains or agrees to cease or refrain from ... doing business with any other person, and any contract or agreement entered into heretofore or hereafter containing such an agreement shall be to such extent unenforcible and void: Provided, That nothing in this subsection (e) shall apply to an agreement between a labor organization and an employer in the

construction industry relating to the contracting or subcontracting of work to be done at the site of the construction ....

29 U.S.C. § 158(e).

**2.** Section 8(e) provides:

> [N]othing in this section (e) shall apply to an agreement between a labor organization and an employer in the construction industry relating to the contracting or subcontracting of work to be done at the site of the construction ....

29 U.S.C. § 158(e).

L.Ed.2d 398, 406 (1982); *Connell Construction Company, Inc. v. Plumbers and Steamfitters Local Union No. 100,* 421 U.S. 616, 95 S.Ct. 1830, 44 L.Ed.2d 418 (1975). Hence, the legality of Article X turns on whether or not that provision was negotiated in the context of a collective bargaining relationship.

Turnkey argues that the Project Agreement is similar to the agreement dealt with by the Court in *Connell,* and, therefore, is not the product of a collective bargaining relationship. The agreement in *Connell* illustrates the situation in which a single union enters into an agreement with a contractor who otherwise has no relationship with that union. In *Connell,* the union coerced the contractor into agreeing to a union signatory subcontractor clause. This clause was the only substantive provision in the agreement. The Court determined such an agreement was not the result of a collective bargaining relationship and, therefore, did not fall within the construction industry proviso. *Connell,* 421 U.S. at 635, 95 S.Ct. at 1841, 44 L.Ed.2d at 433; *see Woelke & Romero Framing, Inc. v. National Labor Relations Board,* 456 U.S. at 653, 102 S.Ct. at 2076, 72 L.Ed.2d at 406 and 407. Unlike the agreement in *Connell,* the Project Agreement was not entered into between a single union and a "stranger" contractor for the sole purpose of implementing a union subcontractor signatory clause. Rather, the Project Agreement was entered into between Turnkey, the general contractor on the project, and all the unions whose members would be working on that project. The negotiating relationship which produced the Project Agreement is clearly collective in the sense that the unions which would likely work on the project were represented in the same manner they are for negotiation of more traditional local collective bargaining agreements. The Project Agreement, by its terms, superseded any conflicting provisions in the general collective bargaining agreements (as to the signatories) for work on the Morrison Center project. Project Agreement, Article II(3). Further, the Project Agreement includes provisions typically found in the more traditional collective bargaining agreements, e.g., hours of work, overtime shifts, wages, fringe benefits, working conditions, and a grievance procedure.

One of the primary purposes for the construction industry proviso is to alleviate the frictions that may arise when union men work continuously alongside non-union men at the same construction site. *Connell,* 421 U.S. at 630–31, 95 S.Ct. at 1838–39, 44 L.Ed.2d at 430–31. The Project Agreement, by its stated purpose, seeks to effectuate this policy. Project Agreement, Article I. The Project Agreement provided reciprocal benefits to all parties and sought to promote harmony on the job site. The Project Agreement appears to have been entered into in the standard collective bargaining relationship between general contractor and applicable unions. Rather than being "union specific" or "employer specific," as are the more traditional collective bargaining agreements, the Project Agreement happens to be "job specific"; that is, it is tailored specifically for the Morrison Center project. The Project Agreement was designed to and does accomplish the same goals as would the more conventional collective bargaining agreement. The court concludes that the construction industry proviso to Section 8(e) is applicable and Article X of the Project Agreement, the union signatory subcontractor clause, is valid.

### 2. Breach of Article X

Defendant Turnkey next argues that Article X of the Project Agreement should be read literally. Under this view, Turnkey's obligations under Article X were satisfied when Marcum agreed in the written subcontract, (1) to be bound by the terms of the Project Agreement and, (2) was signatory to a local collective bargaining agreement at the time it entered into the subcontract with Turnkey. Plaintiffs contend the literal interpretation advocated by Turnkey ignores the purpose of the Project Agreement. They assert Article X must be read as imposing a continuing obligation on Turnkey to ensure that its subcontractors and all sub-tier subcontractors (1) were in compliance with the terms of the Project

Agreement and (2) continued to be signatory to the local collective bargaining agreements. Both parties advance their interpretation as being that which the parties intended at the time the Project Agreement was executed.

The Project Agreement, when read as a whole, makes it clear that the purpose of the agreement was simply to ensure that all crafts people employed on the Morrison Center project would be union crafts people. Literally, Article X requires only that Turnkey in the first instance, and each successive subcontractor, require their subcontractors to agree in writing to be bound by the terms of the Project Agreement. This means that each subcontractor would have a contractual obligation pursuant to Article V of the Project Agreement to employ only union personnel.[3] The union, of course, is the third-party beneficiary of this contractual obligation. The existence of Article V is crucial because without it the last subcontractor in the chain would have no obligation to actually employ union personnel. The only distinction, therefore, between the literal interpretation of Article X and the "continuing obligation" theory asserted by the plaintiffs is that under the literal interpretation the unions would have a cause of action against only that subcontractor who (1) employs non-union personnel, or (2) fails to require his subcontractor to agree in writing to comply with the terms of the Project Agreement. Under the continuing obligation theory, the unions would have a cause of action against said subcontractor and every contractor in the chain up to Turnkey.

It is axiomatic that the union's ability to ensure that all contractors on the project employ union personnel increased proportionately with the number of contractors who would be in breach of the Project Agreement if any one subcontractor employs non-union personnel. While the union may carry a bigger stick under the continuing obligation theory espoused by the plaintiffs, the fact is that the union does carry a stick, albeit a smaller one, under the literal interpretation of Article X. Both views, therefore, are consistent with the purpose of the Project Agreement— that is to ensure a union shop. Because the terms of Article X itself are not ambiguous and that provision is consistent with the purpose of the Project Agreement, the court is unable to consider extrinsic evidence in determining the parties' intent. *Laborers Health and Welfare Trust Fund v. Kaufman & Broad of Northern California,* 707 F.2d 412, 418 (9th Cir.1983).[4] As a result, the court is constrained to find the intent of the parties is that intent manifested by the literal language of Article X unless the policy considerations and rules of construction established by the federal courts for the interpretation of collective bargaining labor agreements dictate otherwise. *Kemmis v. McGoldrick,* 706 F.2d 993 (9th Cir.1983).

Plaintiffs cite *Walsh v. Schlect,* 429 U.S. 401, 97 S.Ct. 679, 50 L.Ed.2d 641 (1977), and subsequent Ninth Circuit decisions as supporting the proposition that union subcontractor signatory clauses similar to Article X should be interpreted to impose upon the general contractor a continuing

**3.** Article V of the Project Agreement provides:

It shall be a condition of employment that all employees of the Employers covered by this Agreement who are members of the Unions in good standing on the effective date of this Agreement shall remain members in good standing and those who are not members on the effective date of this Agreement shall, on the eighth day following the effective date of this Agreement, become and remain members in good standing in the Unions. It shall also be a condition of employment that all employees covered by this Agreement and hired on or after its effective date shall, on the eighth day following the beginning of such employ-

ment, become and remain members in good standing of the Unions.

**4.** It is not clear from the few cases addressing the issue whether or not the parole evidence rule remains a bar to the admission of extrinsic evidence in the interpretation of collective bargaining agreements. *See Kemmis v. McGoldrick,* 706 F.2d 993 (9th Cir.1983). The question, however, is not dispositive in this case. There is no evidence of the circumstances surrounding the negotiation and execution of the Project Agreement or of the parties' subsequent conduct which sheds any light on the parties' intent regarding the extent of the obligations imposed on Turnkey by Article X.

obligation to ensure compliance by all subcontractors. *See Painting and Decorating Contractors Association of Sacramento, Inc. v. Painters and Decorators Joint Committee of the East Bay Counties, Inc.*, 707 F.2d 1067 (1983), *cert. denied*, — U.S. ——, 104 S.Ct. 1709, 80 L.Ed.2d 182 (1984); *Brogan v. Swanson Painting Co.*, 682 F.2d 807 (9th Cir.1982); *Seymour v. Hull & Moreland Engineering*, 605 F.2d 1105 (9th Cir.1979). These cases are inapposite because they assume a breach of the union signatory subcontractor clause. The language used by the court in *Brogan* is illustrative: "[i]f the court did not require the employer to make trust fund payments upon a subcontractor's default, the trustees 'would have no remedy *for defendant's undisputed breach of contract.*' " *Brogan v. Swanson Painting Co.*, 682 F.2d at 809 (emphasis added). The opinions in those cases make it clear that the court was concerned with leaving the plaintiff unions and trust funds a right without a remedy.[5] In this case, however, the question is whether the union has a right in the first instance. Hence, the *Walsh* line of cases do not support the proposition that the union should be able to recover from all contractors in the chain up to and including the general contractor Turnkey.[6]

## CONCLUSION

Article X of the Project Agreement requires only that Turnkey (and every contractor bound by the terms of the Project Agreement), (1) require its subcontractors to agree in writing to be bound by the terms of the Project Agreement and, (2) at the time of contracting, be signatory to a local bargaining agreement. This interpretation is consistent with the language of Article X, with the purpose of the Project Agreement, and with those policies underlying federal labor law. Based upon the foregoing, the Motion for Partial Summary Judgment of the Defendant Turnkey as to that portion of the Complaint alleging breach of Articles V and X of the Project Agreement should be granted. Conversely, Plaintiffs Pipe Trades and Trust Funds' Motions for Partial Summary Judgment should be denied.

IT IS SO ORDERED.

---

**5.** *Seymour v. Hull & Moreland Engineering* 605 F.2d 1105 (9th Cir.1979), presented a slightly different factual situation. The provision at issue in *Seymour* provided that the terms of the local agreement would be binding on and applicable to all work performed by subcontractors. It did not, however, affirmatively require the general contractor to bind his subcontractors to the local agreement. The court held that if the agreement is "applicable" to subcontractors' work, then it is reasonable to infer that the employer must make contributions based upon the non-signatory subcontractor's work. Unlike Article X of the Project Agreement, the provision in *Seymour* did not give the unions a cause of action against the subcontractor. Hence, the court reasoned that the provision would be ineffectual to achieve its obvious purpose unless the general contractor be held responsible for contributions for work performed by the non-signatory subcontractor.

**6.** For purposes of illustration, those cases would be persuasive authority for the proposition that Marcum is liable to the unions for the non-union work performed by Union Plumbing because Marcum failed to require Union Plumbing agree in writing to abide by the terms of the Project Agreement. Similarly, had Turnkey failed to require that Marcum agree in writing to abide by the terms of the Project Agreement, Turnkey would have been liable to the unions for any work performed by non-union personnel of Marcum or its subcontractors. However, such is not the case in this action.