ORDER DENYING DEFENDANTS’ MOTION FOR SUMMARY JUDGMENT ON PHASE I
 

 ILLSTON, District Judge.
 

 Defendants’ motion for summary judgment regarding Phase I of this trial is currently pending before the court. Having carefully considered the argument of the parties and the papers submitted, the motion for summary judgment on Phase I is DENIED.
 

 BACKGROUND
 

 This action was filed on May 27, 1999 by five Nigerian plaintiffs who alleged that defendant ChevronTexaco Corporation
 
 [1]
 
 (“ChevronTexaco” or “CVX”) was involved in the commission of human rights abuses in Nigeria. The complaint has been amended several times, and now includes as defendants both CVX, a United States-based corporation, and ChevronTexaco Overseas Petroleum, Inc. (“CTOP”
 
 [2]
 
 ), a Delaware corporation which is a wholly-owned subsidiary of CVX, as well as 500 “Moe” defendants. Chevron Nigeria Limited (CNL) operates a joint venture with the Nigerian National Petroleum Company, the Nigerian state oil company. At the time of the Parabe incidents, CTOP owned 90% of CNL directly, and owned the other 10% through a wholly-owned subsidiary.
 

 Plaintiffs allege that the United States defendants, CVX and CTOP, are liable for their own acts and for the acts of CNL in three incidents that occurred in Nigeria, in which defendants and CNL allegedly acted unlawfully and committed human rights abuses.
 

 — The first was the Parabe incident, which occurred on May 28, 1998. Plaintiffs allege that CNL, acting in concert with defendants, recruited the Nigerian military and police to fire weapons at Nigerians staging a protest on one of Chevron’s oil platforms, the Parabe platform. Two protesters were killed in this incident. Plaintiffs allege that CNL’s management and security forces were involved in the subsequent detainment and torture of Bola Oyinbo, one of the leaders of the protest movement on the Parabe platform.
 

 — The second and third were the Opia and lkenyan incidents, which occurred on January 4, 1999. Plaintiffs allege a helicopter flown by Chevron pilots and transporting Nigerian military and/or police flew over the community of Opia and opened fire on the villagers, killing one person and injuring others. Plaintiffs allege that the helicopter then flew to the lkenyan community, opened fire and killed one person and injured several others. Plaintiffs allege that thirty minutes later, CNL sea trucks containing CNL personnel and Nigerian military approached Opia and opened fire on the villagers, killing several people. Plaintiffs allege that the soldiers disembarked from the sea trucks and set fire to buildings and livestock, killing another person.
 

 In October, 2001, the parties stipulated to a bifurcated discovery schedule which limited Phase I discovery to issues related to the liability/responsibility of the United States defendants, CVX and CTOP, for whatever occurred in Nigeria at Parabe, Opia and lkenyan. It was contemplated that at the end of Phase I discovery, CVX
 
 *MCCLXXVI
 
 and CTOP would move for summary judgment on the limited issue of their direct or derivative liability for their own acts, or the acts of their employees, agents, co-conspirators, alter egos, or joint venturers. In the summary judgment motion currently before the Court, defendants CVX and CTOP seek summary adjudication that plaintiffs have not presented a triable issue of fact supporting defendants’ liability under any of these theories.
 

 LEGAL STANDARD
 

 1. Summary judgment
 

 Summary judgment is proper “if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.” Fed. R.Civ.P. 56(c). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact.
 
 See Celotex Corp. v. Catrett,
 
 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The moving party, however, has no burden to negate or disprove matters on which the non-moving party will have the burden of proof at trial. The moving party need only point out to the Court that there is an absence of evidence to support the non-moving party’s case.
 
 See id.
 
 at 325, 106 S.Ct. 2548.
 

 The burden then shifts to the non-moving party to “designate ‘specific facts showing that there is a genuine issue for trial.’ ”
 
 Id.
 
 at 324, 106 S.Ct. 2548 (quoting Fed.R.Civ.P. 56(e)). To carry this burden, the non-moving party must “do more than simply show that there is some metaphysical doubt as to the material facts.”
 
 Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,
 
 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). “The mere existence of a scintilla of evidence ... will be insufficient; there must be evidence on which the jury could reasonably find for the non-moving party.”
 
 Anderson v. Liberty Lobby, Inc.,
 
 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).
 

 In deciding a motion for summary judgment, the evidence is viewed in the light most favorable to the non-moving party, and all justifiable inferences are to be drawn in its favor. “Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge ruling on a motion for summary judgment.”
 
 Id.
 
 at 255, 106 S.Ct. 2505.
 

 2. Liability of a parent corporation for the acts of its subsidiary
 

 The law allows corporations to organize for the purpose of isolating liability of related corporate entities.
 
 Frank v. U.S. West, Inc., 3
 
 F.3d 1357, 1362 (10th Cir.1993). Only in unusual circumstances will the law permit a parent corporation to be held either directly or indirectly liable for the acts of its subsidiary. “It is a general principle of corporate law deeply ingrained in our legal system that a corporation is not liable for the acts of its subsidiaries.”
 
 U.S. v. Bestfoods,
 
 524 U.S. 51, 68, 118 S.Ct. 1876, 141 L.Ed.2d 43 (1998).
 
 [3]
 
 
 *MCCLXXVII
 
 Courts do disregard the corporate form in some instances where such disregard is necessary to prevent injustice to a person or entity that would be harmed by refusing to impose liability on the basis of the corporate structure. The party seeking to disregard the corporate form bears the burden of showing that there are good reasons for doing so.
 
 Mobil Oil Corp. v. Linear Films Inc.,
 
 718 F.Supp. 260, 273 (D.Del.1989). “Mere ownership of a subsidiary does not justify the imposition of liability on a parent.”
 
 Pearson v. Component Tech. Corporation,
 
 247 F.3d 471, 484 (3d Cir.2001).
 

 Officers of a parent corporation may be involved in the supervision of a subsidiary corporation without incurring liability for the parent corporation. Typical acts of parent corporation officers which are within the bounds of corporate formalities and do not warrant veil-piercing include: supervising the acts of the subsidiaries; receiving regular reports from the subsidiaries; creating general policies and procedures which the subsidiaries must follow; and overseeing the financial management of the subsidiaries. “Appropriate parental involvement includes: ‘monitoring of the subsidiary’s performance, supervision of the subsidiary’s finance and capital budget and articulation of general policies and procedures.’ ”
 
 U.S. v. Bestfoods,
 
 524 U.S. at 69, 118 S.Ct. 1876 (citations omitted).
 

 Officers of a parent may also simultaneously act as officers of the subsidiary without having their duties as parent corporation officers’ presumed to be effectuated also on behalf of the subsidiary corporation. Liability will not be imposed “on a parent merely because directors of the parent corporation also serve as directors of the subsidiary.”
 
 Pearson,
 
 247 F.3d at 483, citing
 
 Bestfoods,
 
 524 U.S. at 69, 118 S.Ct. 1876.
 

 Doctrines which courts have employed to analyze the liability of a parent corporation include “piercing the corporate veil” (which is often referred to as “alter ego” liability); “single enterprise liability” (referred to in the employment context as “single employer liability”); agency-based liability; aiding and abetting; and ratification. “The terminology used by courts in considering whether a parent corporation will be held liable for the actions of its subsidiary has not been a model of clarity. Plaintiffs so-called ‘alter ego theory’ is often used interchangeably with such expressions as ‘disregarding the corporate entity’ and ‘piercing the corporate veil’.... In addition, some courts use the word ‘agent’ describe what is essentially the same relationship contemplated by the term ‘alter ego.’ ”
 
 Mobil Oil Corp. v. Linear Films Inc.,
 
 718 F.Supp. 260, 266 (D.Del.1989).
 
 [4]
 

 Whether to hold a parent liable for the acts of its subsidiary is a highly fact-specific inquiry. “There are no inflexible tests by which courts determine when to hold corporations liable for the acts of their subsidiaries. Generally, the corporate separateness is respected unless ‘... to do so would work an injustice upon
 
 *MCCLXXVIII
 
 innocent third parties.’
 
 Fidelity & Deposit Co. of Maryland v. USAFORM Hail Pool, Inc.,
 
 523 F.2d 744, 758 (5th Cir.1975). But each case must be considered on its own facts.”
 
 Edwin K. Williams & Co. v. Edwin K. Williams,
 
 542 F.2d 1053, 1063 (9th Cir.1976),
 
 cert. den.
 
 433 U.S. 908, 97 S.Ct. 2973, 53 L.Ed.2d 1092 (1977)
 

 The parties have not squarely confronted whether state or federal law applies to the question of a parent corporation’s liability for the subsidiary’s actions in this case, and the answer to the question does not emerge clearly from the case law. In
 
 U.S. v. Bestfoods,
 
 the Supreme Court noted this uncertainty,
 
 [5]
 
 cited cases from several jurisdictions with differing viewpoints, but declined to rule on the issue because it had not been presented below.
 
 Id.
 
 at 68, 118 S.Ct. 1876. In any event, the tests are quite similar.
 
 [6]
 

 In
 
 Mobil Oil Corp. v. Linear Films Inc.,
 
 718 F.Supp. 260, 267 (D.Del.1989), the court noted the existence of a body of federal common law which has developed on the veil-piercing question and observed that federal courts deciding this question in federal cases have often opted to apply federal common law.
 

 In
 
 Seymour v. Hull & Moreland Engineering,
 
 605 F.2d 1105, 1111 (9th Cir.1979), the federal test for piercing the corporate veil was articulated as follows: “Viewing the jumble of federal court decisions together, we find a sort of generalized federal substantive law on disregard of corporate entity which concentrates on three general factors: the amount of respect given to the separate identity of the corporation by its shareholders, the degree of injustice visited on the litigants by recognition of the corporate entity, and the fraudulent intent of the incorporators. Federal decisions naturally draw upon state law for guidance in this field.” (footnotes omitted)
 

 Many of the cases analyzing the question of a parent’s relationship to its subsidiary do so for the purpose of determining whether that relationship is sufficient to find that the minimum contacts requisite to personal jurisdiction exist over the parent or subsidiary corporation. Personal jurisdiction disputes are generally resolved with reference to law of the state in which the action is brought.
 
 Bellomo v. Pennsylvania Life Co.,
 
 488 F.Supp. 744, 745 (S.D.N.Y.1980).
 

 While the question of whether to pierce the corporate veil has significant overlap with the jurisdictional issue of minimum contacts, the questions of jurisdiction and liability for the subsidiary’s actions are different. The liability question is less procedural than substantive, rendering the federal law a more appropriate guide to
 
 *MCCLXXIX
 
 this Court’s analysis. Where the causes of action in the complaint are federal in nature, application of federal law will better effectuate the purposes of those statutes. Finally, state and federal precedent on this issue do not appear to diverge in any way meaningful to the adjudication of this case. For these reasons, this Court will apply such federal law as it can find when determining these questions.
 

 A. Piercing the corporate veil
 

 “Although the tests employed to determine when circumstances justifying ‘veil-piercing’ exist are variously referred to as ‘alter ego’, ‘instrumentality’ or ‘identity’ doctrines, the formulations are generally similar and courts rarely distinguish between them.”
 
 Pearson v. Component Tech. Corporation,
 
 247 F.3d 471, 485 (3d Cir.2001).
 
 Pearson,
 
 a case decided under the Worker Adjustment and Retraining Notification (WARN) Act, 29 U.S.C. §§ 2101-09, noted that the biggest difference across jurisdictions is whether fraudulent intent in incorporation is necessary for veil-piercing.
 
 Pearson
 
 further observed that federal courts are more likely to pierce the corporate veil where necessary to effectuate a federal statute that would otherwise be frustrated by the state’s corporate laws. In the Ninth Circuit, cases suggest, at least in contexts arising from California, that fraudulent intent in incorporation need not be shown to pierce the veil, as long as it can be shown that the separate identity of the corporation has not been respected and that respecting the corporate form would work an injustice on the litigants.
 
 RRX Industries Inc. v. Lab-Con Inc.,
 
 772 F.2d 543, 550 (9th Cir.1985).
 

 The test for alter ego liability appears almost interchangeable with the veil-piercing test.
 
 See Mobil,
 
 718 F.Supp. at 266, defining alter ego as lack of attention to corporate formalities, commingling of assets, and intertwining of operations. Alter-ego requires demonstrating that the two corporations functioned as a single entity.
 

 B. Integrated enterprise theory of liability
 

 Plaintiffs particularly emphasized the “integrated enterprise” theory of liability at oral argument, citing
 
 Kang v. U. Lim,
 
 296 F.3d 810 (2002) (a Title VII case addressing whether a foreign employer could be liable for employment actions taken against an employee by a domestic employer) and
 
 Pearson v. Component Tech. Corporation, supra
 
 (a case arising under the WARN Act). Under the integrated enterprise theory, courts have applied a far less stringent standard to the question of whether related employers can be held liable for one another’s actions. This standard focuses on economic realities, rather than corporate formalities, and is applied in a variety of employment contexts, including disputes under the Labor Management Relations Act, Title VII, the Fair Labor Standards Act, the WARN Act and the Family and Medical Leave Act.
 
 Pearson
 
 at 486.
 

 While plaintiffs focused significantly on this theory at oral argument, the Court has been unable to find cases applying the “integrated enterprise” theory in a context such as this one. This test, and the joint employer test, have been applied to questions about employer liability and, in some cases, to liabilities arising under CERC-LA. Courts applying the test have noted rather carefully that Congress in passing these statutes had significant remedial purposes in mind, and that these standards are less stringent than those applied to traditional veil-piercing or agency questions.
 
 See Pearson,
 
 at 486, noting: “Ultimately ‘the policy underlying the single employer doctrine [also referred to as the integrated enterprise theory] is the fair
 
 *MCCLXXX
 
 ness of imposing liability for labor infractions where two nominally independent entities do not act under an arm’s length relationship,” ’ quoting
 
 Murray v. Miner,
 
 74 F.3d 402, 405 (2d Cir.1996).
 
 Pearson
 
 referred to the integrated enterprise test as “a sort of labor-specific veil-piercing test.”
 
 Pearson,
 
 at 485.
 

 Questions about veil-piercing are context-specific. The relatively expansive labor and CERCLA context is different from the one faced in this case, and cannot be imported without examination. Nonetheless, the decisions are instructive as they are part of the federal body of common law guiding this Court’s decision about when a parent may be liable for the actions of a subsidiary corporation.
 
 [7]
 

 C. Agency
 

 A parent corporation can be held vicariously liable for the acts of a subsidiary corporation if an agency relationship exists between the parent and the subsidiary. The Restatement 2d of Agency § 14 M states:
 

 A corporation is not the agent of one person, or of a number of persons, who can direct its conduct because holding a majority of its voting shares of stock. Likewise, a corporation does not become the agent of another corporation merely because the other has stock control. The policy which permits individuals to do business by the organization of corporations permits corporations, authorized to do so, to do business in the same way and with the same immunities from liability. However a corporation may become an agent of an individual or of another corporation, as it does when it makes a contract on the other’s account. Thus a subsidiary may become an agent for the corporation which controls it, or the corporation may become the agent of the subsidiary. In some situations, a court may find that the subsidiary has no real existence or assets, that its formal existence is to cloak a fraud or other illegal conduct. As in a similar situation in which an individual is the offender, it may be found that the parent company is the real party to a transaction conducted by the illusory subsidiary and responsible for its transactions as a principal.
 

 Unlike liability under the alter-ego or veil-piercing test, agency liability does
 
 not
 
 require the court
 
 to
 
 disregard the corporate form. Agency has been a theory on which courts in this circuit have allowed plaintiffs to proceed for many decades.
 

 A familiar principle of law has been that a corporation is an entity, distinct in itself. It is true that when resourcefulness of man caused a corporation to be used as a scapegoat for another, courts checked the evil. A common statement of one of the rules is that the entity will “be disregarded ... where a corporation is so organized and controlled, and its affairs are so conducted, as to make it merely an instrumentality or adjunct of another corporation”.... There is just ground for criticism, not of the result reached, but of the theory upon which
 
 *MCCLXXXI
 
 the result is obtained. Some of the early cases, in the situation described in the statement of the rule, based the liability on the principles of agency.... Later, the liability seems to have been based on the theory that the corporate entity was disregarded... .We believe the liability in most of such cases is based correctly on the rules of agency.... As such it is not a new rule of law, but an old one applied to new situations. Where one corporation is controlled by another, the former acts not for itself but as directed by the latter, the same as an agent, and the principal is liable for acts of its agent within the scope of the agent’s authority.
 

 Pacific Can Co. v. Hewes,
 
 95 F.2d 42, 45-46 (9th Cir.1938) (citations omitted).
 

 The Restatement has likewise noted the distinction between veil-piercing and agency theories of liability:
 

 It is useful to distinguish situations in which liability is imposed on a parent because of the existence of the agency relation, in our common-law understanding of that relation, from cases in which the corporate veil of the subsidiary is pierced for other reasons of policy. Unfortunately, however, the courts have not always observed the distinction between these two separate bases for parent’s liability. When liability is fastened upon the parent it is said that the subsidiary is a “mere agent.” The result has been a weakening and muddying of the term “agent” and a failure by courts to state the real reasons for their decision.
 

 Restatement (Second) of Agency, Appendix S 14M, Reporter’s Notes at 68 (1958).
 

 To establish actual agency a party must demonstrate the following elements: “(1) there must be a manifestation by the principal that the agent shall act for him; (2) the agent must accept the undertaking; and (3) there must be an understanding between the parties that the principal is to be in control of the undertaking.”
 
 Rubin Bros. Footwear, Inc. v. Chemical Bank,
 
 119 B.R. 416, 422 (S.D.N.Y.1990). “There is no agency relationship where the alleged principal has no right of control over the alleged agent.”
 
 Morgan Guar. Trust Co. of N.Y. v. Republic of Palau,
 
 657 F.Supp. 1475, 1481 n. 2 (S.D.N.Y.1987);
 
 see also Rubin Bros.,
 
 119 B.R. at 422.
 

 In
 
 Bellomo v. Pennsylvania Life Co.,
 
 488 F.Supp. 744, 746 (S.D.N.Y.1980), a case analyzing whether agency principles could be used to establish jurisdiction over the defendant corporation, the court asked whether the multi-national corporation was actually a “super-corporation.” In
 
 Gallagher v. Mazda Motor of America,
 
 781 F.Supp. 1079, 1083-1084 (E.D.Pa.1992), the court defined the test for whether agency liability applied as requiring a determination of whether the subsidiary is functioning as an incorporated arm of the parent. In
 
 Chan v. Society Expeditions, Inc.,
 
 39 F.3d 1398 (9th Cir.1994), the court asked whether the subsidiary is involved in activities that, but for the subsidiary’s presence, the parent would be forced to undertake itself. In these cases, however, these questions were asked for purposes of determining not whether the parent could be held liable, but whether the parent’s contacts with the forum state could be taken into account for purposes of determining whether the Court had personal jurisdiction over the subsidiary.
 

 In addition to the need for a close relationship or domination between the parent and subsidiary, agency liability also requires a finding that the injury allegedly inflicted by the subsidiary, for which the parent is being held hable, was within the scope of the subsidiary’s authority as an agent. As was noted in
 
 Phoenix Canada Oil v. Texaco,
 
 842 F.2d 1466,
 
 *MCCLXXXII
 
 1477-78 (3d Cir.1988), the proper inquiry regarding the existence of an agency relationship focused on the relationship between the parent and subsidiary corporation as it bore on plaintiffs breach of contract claim, rather than the more global question of whether any sort of agency relationship existed between the parent and the subsidiary; “when customary agency [a opposed to alter ego] is alleged the proponent must demonstrate a relationship between the corporations and the cause of action. Not only must an arrangement exist between the two corporations so that one acts on behalf of the other and within usual agency principles, but the arrangement must be relevant to the plaintiffs claim of wrongdoing.”
 
 See also Scott v. Ross,
 
 140 F.3d 1275, 1280 (9th Cir.1998) (“To incur liability the agent must be acting on the parent’s behalf, within the scope of its authority as agent”).
 

 DISCUSSION
 

 Plaintiffs assert that defendants CVX and CTOP are liable both directly and indirectly for the actions of Chevron Nigeria Limited. Having reviewed the materials submitted by the parties, and the arguments presented, this Court finds that these defendants cannot be held directly liable for the events that transpired. Plaintiffs have submitted no evidence that these defendants directly commissioned the acts that are the subject of plaintiffs’ complaint, nor any sufficient evidence on which a reasonable jury could base a finding of direct liability. Thus summary adjudication must be granted to defendants on this theory of liability.
 

 Whether indirect liability may be imposed is a closer question. At this point, the only question before the Court is whether plaintiffs have presented sufficient evidence to survive summary judgment on their claim that defendants were so integrally involved in the actions and structure of CNL that CNL’s actions in the events that are the subject of the complaint were undertaken on defendants’ behalf. Regardless which test is applied, plaintiffs will have the burden to persuade the Court to disregard the corporate form. At this juncture, the Court finds that plaintiffs have presented facts which, if accepted by a jury, could warrant finding defendants liable for CNL’s actions on an agency theory or based on aiding and abetting or ratification. Consequently, summary adjudication will be denied to defendants on plaintiffs’ theory of indirect or vicarious liability.
 

 1. Defendants’ argument
 

 Defendants’ present motion argues that the Court should grant summary judgment on the question of defendants’ liability for the actions at issue because: (1) plaintiffs’ injuries were caused by the Nigerian military and police; and (2) the military and police were protecting CNL, not defendants. Defendants argue that plaintiffs have not submitted any evidence that creates a material issue of disputed fact regarding defendants’ direct or vicarious liability.
 

 Regarding direct liability, defendants argue that there is no evidence that defendants gave advice about how to handle the “hostage” situation, including communicating at all with the Nigerian military. They contend that claims brought under the Alien Tort Claims Act require a demonstration that the defendants engaged in “state action,” which is absent here. Even if plaintiffs are able to show state action as to CNL, defendants argue that it may not be imputed to defendants under a respondeat superior theory.
 

 As to vicarious liability, defendants argue that there is no basis for claiming that defendants satisfy the alter ego test for liability because CNL has a distinct and separate corporate existence as marked by
 
 *MCCLXXXIII
 
 the separation of the companies’ board meetings, shareholders’ meeting, corporate minutes, and accounts of each company. Further, they contend that there is no evidence that injustice would result from the “misuse of the corporate form.”
 

 To the extent that plaintiffs separately allege an agency theory, defendants argue that plaintiffs must fail because there is no evidence that the defendants directed specific actions of CNL which resulted in injuries to plaintiffs or took over the performance of CNL’s day-to-day operations; or that CNL functioned as defendants’ representative in performing important services which defendants would otherwise have to perform themselves. Defendants also argue that plaintiffs produced no evidence that CNL’s top employees were employees or agents of defendants, or that CNL’s actions in the incidents at issue were within the scope of any agency relationship.
 

 Finally defendants argue that plaintiffs’ RICO claims are deficient because they do not satisfy the jurisdictional requirement that they have a substantial effect on U.S. commerce.
 

 2. Plaintiffs’ response
 

 Plaintiffs rely on numerous theories on which to base defendants’ liability. Plaintiffs argue that there are genuine issues of material fact as to all the following: (a) whether CNL was an agent of defendants; (b) whether CNL was defendants’ alter ego; (c) whether defendants are liable under aiding and abetting and ratification theories; and (d) whether defendants are liable under RICO. Each of plaintiffs’ arguments is analyzed below.
 

 A. Agency
 

 “Whether an agency relationship exists between a parent corporation and its subsidiary is normally a question of fact.”
 
 Japan Petroleum Co. (Nigeria), Ltd. v. Ashland Oil, Inc.,
 
 456 F.Supp. 831 (D.Del.1978). The Court looks to the facts specific to this case for indicia of whether defendants authorized CNL to act as their agent; whether during that agency relationship defendants retained control over plaintiffs; and whether the conduct that plaintiffs’ allege as the subject of their complaint was within the scope of that agency relationship.
 

 Plaintiffs argue that they have presented sufficient facts to raise a genuine issue of material fact regarding whether CNL was acting as defendants’ agent during the Parabe and Opia/Ikenyan incidents. Plaintiffs argue that such a finding would render defendants liable for all intentional torts committed by CNL during the scope of that agency. Plaintiffs suggest that the Court may apply either of two tests for agency: the first test focuses on the parent’s control of the subsidiary, based on
 
 Sonora Diamond Corp. v. Super. Ct.,
 
 83 Cal.App.4th 523, 541, 99 Cal.Rptr.2d 824 (2000),
 
 [8]
 
 while the second test focuses on the parent’s dependence on the subsidiary’s services, based on
 
 Doe v. Unocal Corp.,
 
 248 F.3d 915, 928 (9th Cir.2001).
 
 [9]
 
 
 *MCCLXXXIV
 
 Plaintiffs argue that under either of these tests, they have adduced sufficient facts to survive summary judgment.
 

 Regarding the parent’s control of the subsidiary’s operations, plaintiffs submit a laundry list of facts which they urge the Court to view as indicia of defendants’ control over CNL. Plaintiffs argue that the following facts establish that CNL was acting as defendants’ agent: COPI controlled the appointment of CNL managers and lower level positions; CNL managers simultaneously served in management positions for defendants (see Summary
 
 [10]
 
 at 359-373, stating that George Kirkland was defendants’ Personnel Development Representative while at CNL; Thomas Schull, while at CNL, signed an order from defendants assigning Scott Davis to CNL); CNL employees were paid according to standards set by COPI; high-ranking CNL officials simultaneously performed COPI functions; CNL managers did work for other Nigerian subsidiaries; defendants closely monitored CNL’s oil exploration and production, providing almost daily reports (Hadsell Decl.); CVX required all subsidiary companies to obtain authorization for expenditures in excess of $100,000 (Summary at 404); CNL was audited by defendants three times per year (Summary at 409-415); the Corporate Security Group determined the security policies for CNL and other subsidiaries and influenced CNL policy on security (Summary at 5); the security group evaluated CNL security in the wake of the attacks (Summary at 349-358); and the defendants had extensive communications with the plaintiffs during the Parabe and Opia/Ikenyan incidents. Plaintiffs also argue that defendants are liable under an agency theory because they set salaries for CNL representatives; had veto power over decisions made by high-level managers CNL; and threatened CNL managers with termination if they did not take jobs as managers.
 

 Under the second test, plaintiffs present evidence which they argue shows that CNL functioned as defendants’ representative in Nigeria by engaging in activities that, but for the subsidiary’s presence, defendants would have had to undertake themselves.
 
 Gallagher v. Mazda Motor of America, Inc.,
 
 781 F.Supp. 1079, 1083-84 (E.D.Pa.1992). Plaintiffs argue that the “revolving door” between CNL and COPI for managerial positions and movement of CNL employees to CVX’s other subsidiaries shows CNL’s representative status. Plaintiffs argue that CNL’s performance
 
 *MCCLXXXV
 
 of duties for CNL and non-CNL companies show defendants were much more than holding companies. Further, plaintiffs argue that the communications between the parent company and CNL are evidence of agency.
 
 Modesto City Schools v. Riso Kagaku Corporation,
 
 157 F.Supp.2d 1128, 1135 (E.D.Cal.2001). Plaintiffs argue that the CVX annual report portrayed defendants as part of an integrated operation with CNL. Plaintiffs cite language from the annual report describing CVX as “an international company that, through its subsidiaries and affiliates engages in fully integrated petroleum operations, chemical operations and coal-mining in the United States and approximately 90 countries.” Summary at 314. Plaintiffs argue that the facts indicate that CNL was integral to defendants’ business and that CNL’s oil production represented 20 percent of COPI’s earnings. Summary at 321-23.
 

 The Court recognizes, as defendants contend, that many of the cases cited regarding agency are cases in which the issue presented to the court was jurisdiction. Nonetheless, the Court finds these cases instructive on the factors courts consider when determining whether an agency relationship exists. Further, whether plaintiffs have presented sufficient facts to warrant proceeding to trial on the question of defendants’ liability under an agency theory is necessarily a very fact-intensive inquiry into the structure of the corporations.
 
 Acorn v. Household Intern., Inc.,
 
 211 F.Supp.2d 1160, 1165 (N.D.Cal.2002) (evaluating whether jurisdiction could be established based on agency principles and describing the test of general agency as requiring a “necessarily wide-ranging inquiry” and evaluation of the “numerous and varied indicia” of the relationship between the parent and subsidiary.).
 

 Factors to which the Court has given particular consideration in its analysis include: (1) the degree and content of communications between CNL and defendants, particularly including the communications during the incidents at issue; (2) the degree to which defendants set or participated in setting policy, particularly security policy, for CNL; (3) the officers and directors which defendants and CNL had in common; (4) the reliance on CNL for revenue production and acknowledgment of the importance of CNL and other international operations to the overall success of defendants’ operations; and (5) the extent to which CNL, if acting as defendants’ agent, was acting within the scope of its authority during the events at issue.
 

 1. Communications
 

 The evidence produced by plaintiffs reflects not that defendants made decisions during the attacks, but that there was an extraordinarily close relationship between the parents and the subsidiary prior to, during and after the attacks. For example, defendants and CNL had regular communications regarding security measures before and after the attacks. An analysis of the phone calls between defendants’ personnel in the United States and CNL shows that the volume of calls was higher on May 27, 1998, the first day that the Parabe platform was occupied, than on any other day in the period from November 19, 1997 to January 18, 1999 but one. Hadsell Deck, Exh. 13, BS 61-62.
 
 See also
 
 Deck of Seth Schoen, Exh. C, attached to Summary. The day with the very highest call volume was, according to the Hadsell Deck, Exh. 13 BS 61 -62, another day on which an oil platform was taken over by local people. Summary at 167. Defendants’ security, international and public affairs staff was the contact point for CNL during the communications. Summary at 203-206. Corporate security had frequent communications with CNL regarding Iijaw unrest and what CNL intended to do
 
 *MCCLXXXVI
 
 about that unrest. See Summary at 218, communication from Malcolm McLeod, director of Chevron’s internal security body which oversaw security issues for all subsidiary international Chevron operations, to Mike Uwaka, the head of CNL security, “Beginning 30 Dec 98 all military forces stationed in Iijawland are expected to have been withdrawn by the Federal government. All exploration and exploitation activities of oil companies operating in Iijaw area are also expected to come to a halt ... What’s your read on the situation and what extra measures, if any, do we or the Federal government intend to implement?”
 

 Principal Ilaje negotiators during the Parabe negotiations stated that the explanation provided by Deji Haastrup (CNL’s manager of community relations) for why George Kirkland (CNL’s then-Chairman and Managing Director) could not meet with them during the May 1998 occupation of the platform, was that Kirkland was discussing the Ilaje’s demands with Chevron management in the United States. Ajidibo Decl. para. 16 (Ajidbo was a principal Ilaje negotiator and a founding member of “Concerned Ilaje Citizens”); Me-duoye Decl. para. 8 (involved in Parabe negotiations and chief of the Beku tribe of Ilajes); Odudu Decl. para. 8 (negotiator at Parabe, member of the Ilaje tribe and pastor of the Church of Zion) (all cited in Summary at 148).
 

 2. Policy set by defendants for CNL
 

 The close monitoring of CNL activities through the Upstream Asset Development Process (UADP) and the Integrated Design Team composed of personnel from both defendants and CNL could be found to be well beyond the review of a subsidiary entity which a parent corporation normally performs. Chevron expressed a commitment to “monitor daily business operations ... to ensure consistent compliance with Company policies, procedures and standards.” Summary at 404-406.
 

 3. Common management
 

 The Court is mindful that the Supreme Court has recently outlined the limited significance of shared management between parent and subsidiary on the parent’s vicarious liability:
 

 It is entirely appropriate for directors of a parent corporation to serve as directors of its subsidiary, and that fact alone may not serve to expose the parent corporation to liability for its subsidiary’s acts. This recognition that the corporate personalities remain distinct has its corollary in the well established principle of corporate law that directors and officers holding positions with a parent and its subsidiary can and do “change hats” to represent the two corporations separately, despite their common ownership.
 

 United States v. Bestfoods,
 
 524 U.S. 51, 69, 118 S.Ct. 1876 (1998).
 

 While not sufficient on its own, this overlap between officers and directors, coupled with other factors tending to show agency, is probative of the question of whether an agency finding is warranted. Here, defendant functioned as a multi-na-tional corporation in which CNL played a significant role. Defendant had much more than the usual degree of control over CNL’s operations, and particularly in setting security policy. The revolving door of managers and directors at the highest levels between CNL and defendants is dramatic evidence of the close relationship that was shared and can be viewed as further evidence of an agency relationship. See Summary at 335-338. For example, Richard Matzke sat simultaneously as a member of CNL’s Board of Directors while serving as President of Chevron,
 
 *MCCLXXXVII
 
 USA and director of COPI. See Summary at 385, Voorhees Decl., Exh. A at 27.
 

 4. Importance of CNL to defendants’ overall operations
 

 “[T]he fact that a parent holds out to the public that a subsidiary is a department of its own business increases the likelihood that the parent will be held liable for the subsidiary’s acts.”
 
 Japan Petroleum,
 
 456 F.Supp. at 841. There is significant evidence in the record that defendant Chevron held itself out as an international company of which CNL is a significant part. Chevron describes itself in its annual report as “an international company, that through its subsidiaries and affiliates, engages in fully integrated petroleum operations, chemical operations and coal mining in the United States and approximately 90 countries.” Summary at 314. Defendants’ annual reports describe the expansion of Chevron’s international production as its main area of focus. Summary at 321-323. More than 20 percent of defendants’ earnings were accounted for by CNL’s production. Hadsell Decl. Exh. 59, 61. “The engine driving Chevron’s growth is its collection of international upstream operations.” Hadsell Decl., Exh. 62, BS 177 (Summary at 321).
 

 Although CNL profits did not return directly to the United States because in the U.S. they would be subject to tax liability, CNL’s profits were used to fund other Chevron subsidiary corporations. Summary at 468. Thus defendants bene-fitted in a very direct way from CNL’s revenues.
 

 5. Other evidence that CNL was acting within the scope of its authority as defendants’ agent
 

 There is significant evidence that defendants viewed unrest in Nigeria as directly affecting CNL’s oil production, and consequently defendants’ revenues. Defendants’ 1997 annual report stated,
 

 In certain locations ... political conditions have existed that may threaten the safety of employees and the company’s continued presence in those countries. Internal unrest or strained relations between a host government and the company or other governments may affect the company’s operations. Those developments have, at times, significantly affected the company’s operations and related results and are carefully considered by management when evaluating the level of current and future activity in such countries.
 

 Hadsell Decl., Exh. 58, BS 173.
 

 Defendants’ Corporate Security Group, prior to the May incident, held meetings in London regarding possible developments in the Nigerian political climate and how those developments would affect CNL. CNL’s public affairs manager Sola Omole attended those meetings. Depos. of Omole at Voll., January 16, 2003, Summary at 5.
 

 On June 1, 1998, four days following the May incident, Thomas Schull (CNL’s assets manager) wrote to Joseph Lorenz (one of the San Ramon International Affairs Group), Ed Chow (defendants’ manager of international relations prior to 1998), James Bates, Ray Wilcox (General Manager of the San Ramon business unit), Scott Taylor (head of Chevron’s Corporate Security Group which was headquartered in London and oversaw security policy and planning for all Chevron subsidiaries), and Sarah Loo (an administrative assistant to Richard Matzke, then-president of COPI) that “full production has been restored” and “all operations are normal.” Summary at 499, Hadsell Decl., Exh. 85 BS 229. The daily drilling reports which CNL submitted to defendants at midnight of each day (Summary at 7) documenting the volume of oil drilled during the Parabe incident, reflected shutdowns in drilling and production due to “community prob
 
 *MCCLXXXVIII
 
 lems” and the “Parabe situation.” Summary at 110. These daily drilling reports were communicated to James Bates in CNL’s Nigeria Business Unit at COPI headquarters in San Ramon. Summary at 111.
 

 The facts submitted by plaintiff, taken together, are such that a reasonable juror could find that CVX and CTOP, the U.S.based defendants, exercised more than the usual degree of direction and control which a parent exercises over its subsidiary. The agency relationship alleged by plaintiffs is directly related to the plaintiffs’ causes of action, in that plaintiffs allege that defendants were significantly involved in security matters and benefitted directly from CNL’s oil production, which was made possible — or at least protected — by the military’s wrongful use of force to quell unrest among Nigerians. Plaintiffs’ complaint argues that defendants and CNL increased their revenues both through the military’s response to Nigerian unrest and through their cover-up in the United States of the events after they occurred. As was noted in
 
 Phoenix Canada Oil:
 
 “The parents and subsidiaries may fully maintain their separate corporate existences; yet, as any two unrelated companies, they might have entered into a limited agency relationship for a specific transaction. Whether this occurred here is a question of fact[.]”
 
 Phoenix Canada Oil v. Texaco Inc.,
 
 842 F.2d 1466, 1478 (3d Cir.1988).
 

 The representations made about Nigerian oil production as a percentage of overall revenues; the revolving door of managers and directors between the parent and subsidiary; the hiring process which involved selection of CNL officers by United States defendants’ Personnel Development Committees; the daily communications between CNL and defendants, and particularly the sharp rise in communications during the attacks; and the corporate security committee which monitored and planned security operations for the subsidiaries are all evidence from which an agency relationship could be found and from which it could be determined that CNL’s actions may have been within the scope of that relationship. This Court finds that the plaintiffs have presented sufficient facts from which a reasonable jury could find that an agency relationship existed and that CNL’s alleged actions during the incidents at issue were within the scope of that agency relationship.
 

 B. Alter-Ego Liability
 

 Plaintiffs argue that defendants are the alter egos of CNL for purposes of liability under the Alien Tort Claims Act, because defendants “knew of and approved CNL’s use of and payments to the Nigerian military.” Opp. at 15. Plaintiffs argue that the alter ego doctrine may be applied where doing so comports with the “broad principle that a corporate entity may be disregarded in the interests of public convenience, fairness and equity.”
 
 Id.
 

 Plaintiffs’ argument for alter-ego liability fails. As the case law of this Circuit has evolved, “a sort of generalized federal substantive law on disregard of [the] corporate entity” has developed.
 
 Seymour v. Hull & Moreland Eng’g,
 
 605 F.2d 1105, 1111 (9th Cir.1979). The test for whether subsidiaries and parent corporations are alter egos requires a determination whether: (1) there is such a unity of interest between the corporate personalities that they do not function as separate personalities and (2) failure to disregard the separate nature of the corporate entities would result in fraud or injustice.
 
 Doe v. Unocal Corp.,
 
 248 F.3d 915, 926 (9th Cir.2001). Some courts have included whether the corporate entities committed fraud in incorporation.
 
 See, e.g., Laborers Clean-Up Contract Admin. Trust Fund v. Uriarte Clean-Up Serv., Inc.,
 
 736 F.2d
 
 *MCCLXXXIX
 
 516, 524 (9th Cir.1984)(“To determine whether stockholders are personally liable for the debts of their corporations, this court relies on three factors: the amount of respect given to the separate identity of the corporation by its shareholders, the fraudulent intent of the incorporators, and the degree of injustice visited on the litigants by recognition of the corporate entity”).
 

 Plaintiffs do not advance the theory that defendants engaged in fraud in the incorporation of defendants and CNL. Even if this Court were to apply the less stringent test articulated in
 
 Doe v. Unocal Corp.,
 
 248 F.3d 915, 926 (9th Cir.2001), which does not require fraud in incorporation, plaintiffs still fail to present a material issue of disputed fact regarding their alter ego theory of liability. Plaintiffs have not submitted evidence that demonstrates that inequity would result from the recognition of the corporate form. The inability of plaintiffs to recover for their losses is not a sufficient inequity to justify overlooking the corporate form.
 
 See e.g., Seymour,
 
 605 F.2d at 1113 (“Lastly, we see no injustice in the effect of the trial court’s findings. While it is true that the trustees apparently have a judgment for several thousand dollars against an insolvent defendant, their inability to collect does not, by itself, constitute an inequitable result.”). Here, there is simply no evidence to support a finding that incorporation was undertaken in bad faith or that observing the corporate form would achieve an inequitable result. Thus plaintiffs’ alter-ego theory and/or piercing the corporate veil theories are not bases on which a reasonable jury might disregard the corporate form to hold defendant liable for the acts of its subsidiary.
 

 C. Aiding and abetting and ratification theories
 

 In the “general allegations” that plaintiffs include in their Fifth Amended Complaint, plaintiffs state that defendants and CNL “aided and abetted and/or ratified the attacks on Parabe, Opia and Iken-yan by,
 
 inter alia,
 
 knowingly providing substantial assistance and/or encouragement to the military and/or police that perpetrated the attacks, and by conducting a knowingly false publicity campaign designed to deflect international criticism of the military and/or police and of Chevron for their respective roles in the attacks.” Fifth Amended Compl. para. 79. Plaintiffs’ opposition brief clarifies at n. 29 that plaintiffs are asserting the theories of aiding and abetting and ratification “with respect to all of their claims.” Opp. at 27, n. 29.
 

 To the extent that plaintiffs may proceed against defendants on the theory that CNL was acting as defendants’ agent, they may also proceed on their claims for aiding and abetting and ratification. In addition, even if plaintiffs’ theory that CNL was conducting itself as defendants’ agent during the incidents fails, plaintiffs have an independent claim under their ratification theory that their subsequent ratification of CNL’s actions created an agency. “An agency may be created, and an authority may be conferred by a precedent authorization, or a subsequent ratification.”
 
 Rakestraw v. Rodrigues,
 
 8 Cal.3d 67, 73, 104 Cal.Rptr. 57, 500 P.2d 1401 (1972). Ratification is demonstrated through knowing acceptance after the fact by the principal of an agent’s actions. Plaintiffs claim that defendants’ media campaign defending CNL constituted ratification. Plaintiffs argue that defendants’ media campaign involved dissembling about “the complicity of CNL” and that defendants “covered up” for their own personal benefit. Covering up of the misdeeds of an agent can also constitute ratification.
 
 Seymour v. Summa Vista Cinema, Inc.,
 
 809 F.2d 1385, 1388 (9th Cir.
 
 *MCCXC
 
 1987). Where the acts by the agent were not within the scope of the agency relationship, if they are not disavowed by the principal, failure to disavow may constitute ratification.
 
 Schultz Steel Co. v. Hartford Accident & Indemnity Co.,
 
 187 Cal.App.3d 513, 519, 523, 231 Cal.Rptr. 715 (1986)(“A purported agent’s act may be adopted expressly or ... by implication based on conduct of the purported principal from which an intention to consent or adopt the act may be fairly inferred.”)
 

 Plaintiffs have pointed to numerous instances in the evidentiary record in which defendants made conflicting statements to the media about CNL’s involvement in the attacks. These statements could be evidence of a cover-up, or ratification. The conflicting evidence includes reporting that the military approached Chevron to provide transportation to the platform and that CNL did not own helicopters or boats. For example, in a September 30, 1998 interview on KPFA radio, the then-head of Chevron Corporation’s Media Affairs Department in San Francisco, Michael Lib-bey, stated, “When they [Nigerian law enforcement] came to us and said, ‘Take us to that project,’ we obviously had no choice to comply.” Hadsell Deck, Exh. 108, BS 303-305 at 304 (Summary at 562). In apparent contradiction to this statement, in an earlier interview Chevron Media Relations employee stated, “After the protestors failed to release the hostages ... police were asked to intervene.” Hadsell Deck, Exh. 81, BS 219-222 at 219-220 (Summary at 264).
 

 There is also evidence that defendants made contradictory statements about CNL’s ownership of the helicopters and boats used to transport the Nigerian military to the platform. Most of defendants’ statements took great pains to suggest that the helicopters and boats were not CNL’s to loan to the Nigerian military, but rather property of the joint venture. Nonetheless, some of defendants’ statements indicate that these helicopters and boats were actually viewed by defendants and CNL as CNLs’ property. In a February 26, 1999 email, Bill Irwin, who worked for Warner Williams, COPI’s Manager of International Relations in Washington, D.C., stated to CNL and Chevron officials that the question of whose helicopters or boats were used could be addressed by focusing on the fact that they were owned by the Joint Venture “which can be interpreted, perhaps as much closer to the Nigerian govt” and that because the government has a 60 percent ownership interest in the Joint Venture it is “so much more difficult to refuse access to our equipment.” Hadsell Deck, at Exh. 160, BS 509-510 (Summary at 590-591). While this statement at least appears to concede that the equipment is “our[s],” other communications with the media suggest that CNL had no relationship at all to the equipment. In an email from Joseph Lorenz to Deji Haastrup on February 23, 1999, responding to Haastrup’s email regarding questions from a journalist about the ownership of the boats and helicopters, Lorenz advised a response that “Chevron has no involvement whatsoever in this activity [in the government’s use of boats and helicopters leased by the joint venture.].” Hadsell Deck, Exh. 153, BS 434-438 (Summary at 586). Accordingly, there is sufficient evidence from which a reasonable jury could infer a cover-up or ratification of CNL’s activities.
 

 D. Plaintiffs’ RICO claims
 

 Defendants have objected to the inclusion of conspiracy claims in plaintiffs’ complaint. Conspiracy is alleged by plaintiffs as an element of their RICO claim. In their Seventh Claim for Relief for RICO violations, plaintiffs allege that defendants were co-conspirators. Plaintiffs’ complaint alleges that defendants “and
 
 *MCCXCI
 
 their agents and co-conspirators” formed and constituted a RICO enterprise. A conspirator under RICO “must intend to further an endeavor which, if completed, would satisfy all of the elements of a substantive criminal offense, but it sufficient that he adopt the goal of furthering or facilitating the criminal endeavor.”
 
 Salinas v. U.S.,
 
 522 U.S. 52, 65, 118 S.Ct. 469, 139 L.Ed.2d 352 (1997). Defendants argue that plaintiffs have not properly pled their conspiracy claim. The Court declines to grant summary judgment on the grounds that the claim was pled improperly.
 

 Defendants’ motion also argues that plaintiffs have introduced no evidence to show that defendants collaborated with CNL or the Nigerian military or police to commit the predicate acts alleged as part of plaintiffs’ RICO claim. Having allowed the balance of plaintiffs’ claims to proceed against defendants on the grounds that plaintiffs have created a triable issue of material fact regarding defendants’ liability for CNL’s acts under an agency theory, the Court allows plaintiffs’ RICO claims to proceed on this basis as well.
 

 Pursuant to 18 U.S.C.1962(c), RICO prohibits (1) conduct (2) of an enterprise (3) through a pattern of (4) racketeering activity affecting interstate commerce. Evidence of an agency relationship is a sufficient basis for a finding of Lability under RICO.
 
 Brady v. Dairy Fresh Products,
 
 974 F.2d 1149, 1154-55 (9th Cir.1992). As this Court has determined that plaintiffs have created a genuine issue of material fact with respect to whether CNL was acting as defendants’ agent, and the question of whether CNL committed acts in violation of RICO has been reserved for Phase II, at this juncture summary judgment on the RICO claims would be premature.
 

 Defendants’ remaining objections to plaintiffs’ RICO claims are based on plaintiffs’ alleged failure to demonstrate that their claims had a substantial impact on United States’ commerce (a necessary prerequisite to jurisdiction over RICO claims based on the extraterritorial application of the RICO statute). In
 
 North South Finance Corp. v. Al-Turki,
 
 100 F.3d 1046, 1051 (2d Cir.1996),the court outlined the conduct test and the effects test, two bases on which jurisdiction may be asserted under RICO in this action. The question of whether this Court may assert jurisdiction over defendants under the “effects” test with respect to plaintiffs’ RICO claims was addressed by this Court in its January 23 Order, at pages 12-13. The Court refers the parties to the relevant section of that Order and incorporates its analysis by reference; it will not be repeated here.
 

 E. Defendants’ state action argument
 

 Defendants argue that they are not liable under the Alien Tort Claims Act because plaintiffs have not presented sufficient facts to show that CNL engaged in state action, as required by the ATCA. Plaintiffs argue that this Court should not decide whether CNL was a state actor, at this stage, because CNL’s actions at Par-abe and Opia/ Ikenyan are the subject of Phase II of this trial. The Court agrees. Whether state action must be pled as an element of plaintiffs’ ATCA claims and, if so, whether plaintiffs are able to demonstrate evidence to satisfy the state action requirement, are unsuitable for summary adjudication in Phase I of this trial. At this juncture, defendants’ motion for summary judgment based on the failure to adequately demonstrate state action is DENIED. Defendants may raise this argument in Phase II of this action, should they deem it appropriate.
 

 
 *MCCXCII
 
 CONCLUSION
 

 Accordingly, defendants’ motion for summary judgment is DENIED. [Docket # 277]
 

 IT IS SO ORDERED.
 

 [1]
 

 . Chevron Texaco Corporation was known as Chevron Corporation until October 9, 2001, when it changed its name.
 

 [2]
 

 . CTOP was previously known as Chevron Overseas Petroleum, Inc. or “COPI.” It is sometimes referred to as COPI in the discussion which follows.
 

 [3]
 

 . In
 
 U.S. v. Bestfoods,
 
 the Supreme Court addressed the question of liability under the Comprehensive Environmental Response, Compensation and Liability Act of 1980 (CERCLA), 42 U.S.C. § 9601 et seq., which imposes liability for costs of cleaning up industrial waste generated by polluting facilities. The Supreme Court held that a parent corporation could not be held liable as an operator of a polluting facility where the facility was owned or operated by a subsidiary corporation, unless the corporate veil could be pierced. The corporate parent could be held directly liable if it actively participated in and exercised control over the operations of the facility itself.
 

 [4]
 

 . As these “doctrines” illustrate, the question of when a parent can be held liable for the actions of its subsidiary, and vice versa, has spawned more rhetorical flourish than clear analytical guidance. The United States Supreme Court recognized this in
 
 First National Bank v. Banco Para El Comercio Exterior de Cuba,
 
 462 U.S. 611, 623, 103 S.Ct. 2591, 77 L.Ed.2d 46 (1983), when it quoted then-Judge Cardozo’s opinion in
 
 Berkey v. Third Avenue R. Co.,
 
 244 N.Y. 84, 155 N.E. 58, 61 (1926): "The whole problem of the relation between parent and subsidiary corporations is one that is still enveloped in the mists of metaphor. Metaphors in law are to be narrowly watched, for starting as devices to liberate thought, they end often by enslaving it.”
 

 [5]
 

 . “There is significant disagreement among courts and commentators over whether, in enforcing CERCLA's indirect liability, courts should borrow state law, or instead apply a federal common law of veil piercing.”
 
 U.S. v. Bestfoods,
 
 524 U.S. at 68, 118 S.Ct. 1876;
 
 see also Kamen v. Kemper Fin. Serv.,
 
 500 U.S. 90, 99, 111 S.Ct. 1711, 114 L.Ed.2d 152 (1991) (“the presumption that state law should be incorporated into federal common law is particularly strong in areas in which private parties have entered legal relationships with the expectation that their right and obligations would be governed by state-law standards ... Corporation law is one such area.”).
 

 [6]
 

 . California law on piercing the corporate veil is substantially similar to the rule announced in federal cases.
 
 See Ministry of Defense v. Gould,
 
 969 F.2d 764, 769, n. 3 (9th Cir.1992), quoting
 
 Mesler v. Bragg Mgt. Co.,
 
 39 Cal.3d 290, 216 Cal.Rptr. 443, 702 P.2d 601, 606 (1985) and noting that the requirements for piercing the corporate veil under California law and federal law are quite similar: "(1) that there be such a unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist and (2) that, if the acts are treated as those of the corporation alone, an inequitable result will follow.”
 

 [7]
 

 . The parties also cited
 
 Meyer v. Holley,
 
 537 U.S. 280, 123 S.Ct. 824, 154 L.Ed.2d 753 (2003) at oral argument. In
 
 Meyer,
 
 the Supreme Court held that liability does not run to individual officers or owners for violations of the Fair Housing Act, absent special circumstances. In so ruling
 
 Meyer
 
 reversed a Ninth Circuit decision to the contrary. The Court noted in
 
 Meyer
 
 that traditional tort theories of liability, including vicarious liability and agency principles, apply to causes of action in tort authored by Congress. “The Ninth Circuit’s holding that the Act made corporate owners and officers liable for an employee's actions is rejected.” 123 S.Ct. at 824. The Court noted in
 
 Meyer
 
 that HUD has issued regulations specifically incorporating traditional principles of tort law.
 

 [8]
 

 . In
 
 Sonora Diamond Corp. v. Super. Ct.,
 
 83 Cal.App.4th 523, 541, 99 Cal.Rptr.2d 824 (2000), the court considered whether agency principles were a sufficient basis for the assertion of general jurisdiction over a foreign corporation. The court held, "[T]he case law identifies one situation when the acts of the parent may be found to trespass the boundaries of legitimate ownership and control of the subsidiary and expose the parent to the power of the state in which the subsidiary does business. Thus, where the nature and extent of the control exercised over the subsidiary by the parent is so pervasive and continual that the subsidiary may be considered nothing more than an agent or instrumentality of the parent, notwithstanding the maintenance of separate corporate formalities, jurisdiction over the parent may be grounded in the acts of the subsidiary/agent.”
 
 Id.
 

 [9]
 

 . This opinion, which affirmed the district court's dismissal of a French corporate defen
 
 *MCCLXXXIV
 
 dant on jurisdictional grounds, remains good law. The same case has generated several other written opinions, including notably
 
 John Doe I v. Unocal Corp.,
 
 2002 WL 31063976, 2002 Daily Journal DAR 10,794 (9th Cir. September 18, 2002), which reversed the district court’s summary judgment in favor of US-based oil companies and which held that there was sufficient evidence to warrant trial on charges that the oil companies had aided and abetted the Myanmar military in committing alleged violations of the law of nations. On February 14, 2003, the Ninth Circuit agreed to rehear
 
 John Doe I en banc;
 
 accordingly, the opinion was vacated. On April 9, 2003, the Circuit ordered the parties to be prepared to address the question whether, in order to determine if Unocal may be held liable for the acts of the government of Myanmar, federal courts should apply an international-law aiding and abetting standard, or whether Unocal's liability should be resolved according to general federal common law tort principles. The
 
 en banc
 
 hearing was held on June 17, 2003. On December 9, 2003, the Circuit ordered the case withdrawn from submission pending issuance of the United States Supreme Court’s decision in
 
 Sosa v. Alvarez-Machain,
 
 - U.S. -, 124 S.Ct. 807, 157 L.Ed.2d 692, 2003 WL 22070605 (Dec. 1, 2003).
 

 [10]
 

 . The “Summary” refers to Plaintiffs’ Evidence Rule 1006 Summary of Facts Filed in Support of Plaintiffs’ Opposition to Defendants’ Motion for Summary Judgment or Summary Adjudication (Phase I).